UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ION BAROI, et al., | ) |
| | ) |
| Plaintiffs, | )   2:09-CV-00671-PMP-GWF |
| | ) |
| v. | ) |
| | ) |
| PLATINUM CONDOMINIUM | )   <u>ORDER</u> |
| DEVELOPMENT, LLC; MARCUS | ) |
| HOTELS, INC.; and MARCUS | ) |
| MANAGEMENT LAS VEGAS, LLC, | ) |
| | ) |
| Defendants. | ) |

Presently before the Court is Plaintiffs' Motion for Partial Summary Judgment (Doc. #136/#138), filed on October 31, 2011.  Defendants Platinum Condominium Development, LLC ("Platinum Development"); Marcus Management Las Vegas, LLC ("Marcus Management"); and Marcus Hotels, Inc. ("Marcus Hotels") filed an Opposition (Doc. #151) and Countermotion for Partial Summary Judgment (Doc. #160) on December 14, 2011.  Plaintiffs filed a Reply and Opposition (Doc. #180/#181/#184) on January 18, 2012.  Defendants filed a Reply (Doc. #189) on February 1, 2012.  Defendants submitted a Notice of Supplemental Authority Pertinent to the Motions for Summary Judgment on Securities Law Claims (Doc. #220) on March 27, 2012.  Plaintiffs filed a Response (Doc. #222) on May 4, 2012.

This case arises out of Plaintiffs' purchases of condominium units in Defendant Platinum Development's condo/hotel project, the Platinum, located in Las Vegas, Nevada. Plaintiffs brought suit in Nevada state court in March 2009, and Platinum Development removed the action to this Court.  (Pet. for Removal (Doc. #1).)  Among the various claims

Plaintiffs assert against Defendants are violations of Nevada securities laws in counts

fifteen, sixteen, and seventeen of the Third Amended Complaint.  (Third Am. Compl. (Doc.

#89).)  The parties now cross move for partial summary judgment on these claims.  As to all

three counts, the parties dispute whether selling the condominium units with a rental

agreement constituted a "security."  With respect to count fifteen, the parties also dispute

whether that claim is time barred.  Finally, with respect to count seventeen, the parties

dispute whether Marcus Hotels has control person liability under Nevada securities law.

## I.  BACKGROUND

### A.  The Initial Sales Effort

Plaintiffs purchased condominium units in the Platinum, a condo/hotel developed

by Platinum Development.  (Pls.' Mot. Summ. J. (Doc. #136) ["MSJ"], Ex. 7 at 27; Defs.'

Opp'n to Mot. Summ. J. (Doc. #151) ["Defs.' Opp'n"], Exs. 53-111.)  Platinum

Development originally was formed by non-party Marcus Development, LLC ("Marcus

Development") and two other entities, whose interests Marcus Development bought in 2006

and 2007, making Marcus Development the sole member of Platinum Development.  (MSJ,

Ex. 7 at 80.)  Marcus Development also is a member of Marcus Management, which was

formed to manage the rental program at the Platinum.  (Decl. of Steven S. Bartelt (Doc.

#152) ["Bartelt Decl."] at 2.)  Marcus Development is wholly owned by Marcus Hotels.

(MSJ, Ex. 7 at 64.)

A presentation at a September 2003 Capital Asset Committee Meeting, prior to

the Platinum condominium units being offered for sale, stated that the Platinum--

> cannot generate enough room rental income for the owners to satisfy
> any type of return for [proposed selling prices ranging from $480,000
> to $590,000].  We comfortably can deliver enough room rental split to
> support a $300,000 selling price, but would have a hard time delivering
> enough rental income to support a $500,000 sales price.  This really
> makes the decision as to where to price the units very important and
> the consideration of whether or not people will indeed be looking for a
> return off of this investment critical.

(MSJ, Ex. 43 at 4, 32.)  This analysis included a "Projected Room Rate Matrix" which listed the average expected rates for the rooms in both high and low season, with a low of $85 in low season and a high of $175 in high season for a small one bedroom unit, and a low of $95 and a high of $245 for a large one bedroom unit.  (Id. at 8.)  It also included an Owner Cash Flow Analysis which projected negative net cash flow on all units except the large one bedroom unit if the large one bedroom unit was priced at $325,000.  (Id. at 10.)

Platinum Development began reserving units for prospective buyers in January 2004.  (Defs.' Opp'n, Ex. 38 at 70, 86.)  Platinum Development utilized three salespersons to sell the units, Deanna Serio ("Serio"), Allison Mizener ("Mizener"), and Dale Thornburgh ("Thornburgh").  (MSJ, Ex. 5 at 190-91, Ex. 11 at 55.)  The sales force made efforts to ensure each prospective buyer heard the same representations regarding the project.  (MSJ, Ex. 1 at 103, Ex. 11 at 55.)  According to Mizener, she knew prior to the Platinum sales trailer being opened that salespersons should not project income to sell the units.  (Defs.' Opp'n, Ex. 38 at 41.)  Serio likewise indicated that Marcus Hotels employees told her it was "very important for us not to project any income" from the rental program. (Defs.' Opp'n, Ex. 39 at 79, 83.)

Sales materials directed any inquiries regarding the rental program to Marcus Hotels employee Bruce Hoffmann ("Hoffmann").  (MSJ, Ex. 16, Attach. L.)  Hoffmann denies he provided room rates and occupancy projections to prospective buyers.  (Defs.' Opp'n, Ex. 36 at 78.)  According to Hoffmann, he told investors Marcus Hotels was "not going to give out any average rate or occupancy projections."  (Id.)  Instead, he referred prospective buyers to the websites of the Las Vegas Convention and Visitors Bureau and the University of Nevada, Las Vegas, and buyers could "draw their own conclusions as to how they thought the property's rental program would perform."  (Id.)

However, in a February 2004 email from Marcus Hotels employee Keith Halfmann ("Halfmann") to Marcus Hotels president William Otto ("Otto"), Halfmann

1   indicated that while setting up a model room at the Platinum a few days prior, he overheard

2   Thornburgh on a tour with a prospective buyer.  (MSJ, Ex. 26, Ex. 30 at 97.)  The

3   prospective buyer asked what type of rental income could be expected, and, according to

4   Halfmann, Thornburgh stated: "The First year you will be writing checks to cover the

5   mortgage[.]  The Second year you will be writing less checks[.]  The Third year you will

6   start to see a payback."  (Id.)  At his deposition, Thornburgh denied discussing rental

7   income with prospective buyers.  (Defs.' Opp'n, Ex. 40 at 111.)

8        Peter Rockwood ("Rockwood"), Vice President and General Manager of the

9   Platinum, testified at his deposition that all three salespersons were promoting the

10  opportunity to place the units in the rental program as a leading selling point for the units.

11  (Pls.' MSJ, Ex. 4, Ex. 5 at 190-91.)  Additionally, Marcus Hotels and Platinum management

12  were aware that many prospective buyers were looking to purchase units for the sole

13  purpose of receiving a return, either through resale or through participation in the rental

14  program.  (MSJ, Ex. 5 at 194, Ex. 39.)  However, Mizener testified that not every

15  prospective buyer was interested in the rental program, and she believed most were going to

16  sell their units before the Platinum was even constructed.  (Defs.' Opp'n, Ex. 38 at 170-71.)

17              **B. The 2004 Public Offering Statement**

18       On March 17, 2004, Platinum Development sent out packets to over 200

19  prospective buyers.  (MSJ, Ex. 1 at 16, 20, 98-99, 114, Ex. 2, Ex. 13.)  The packet included

20  a cover letter, the Purchase and Sale Agreement, a Marcus Hotels press release, Marcus

21  Double Occupancy Opportunities, Potential Room Rate Ranges, Repair & Maintenance

22  Fee, Summary of Rental Agreement for the Platinum Suite Hotel and Spa, and a Marcus

23  Hotels Marketing Outline.  (MSJ, Ex. 1 at 16, 20, 98-99, 114, Ex. 2, Ex. 13.)  The packet

24  also included the Nevada Public Offering Statement with various attachments including a

25  sample Rental Management Agreement, a sample Hotel Management Agreement, a sample

26  Association Management Agreement, Some Frequently Asked Questions by Prospective

Purchasers Who are Interested in the Rental Program, and illustrative floor plans (collectively the "2004 POS").  (MSJ, Ex. 1 at 16, 20, 98-99, 114, Ex. 2, Ex. 13.)  The March 17, 2004 letter was a standard form letter sent to all prospective purchasers who had reserved a unit.  (MSJ, Ex. 1 at 16.)  The letter and 2004 POS also were available at the Platinum sales trailer.  (Id.)

The Purchase and Sale Agreement advised prospective buyers that a unit owner could not use a unit as a primary residence, and units could not be occupied for more than twenty-nine consecutive days.  (MSJ, Ex. 2.)  The Purchase and Sale Agreement and 2004 POS also advised prospective buyers that after the Platinum was constructed, the Platinum's condominium association would enter into an Association Management Agreement and a Hotel Management Agreement with a "Hotel Manager," identified as Marcus Management.  (MSJ, Ex. 2, Ex. 16, Add. H, J.)  Prospective buyers were provided a summary of the proposed agreements, as well as copies of the agreements.  (MSJ, Exs. 2, 16.)

Under the Association Management Agreement, Marcus Management would perform most condominium association duties on behalf of the association, such as maintenance and handling financial affairs.  (MSJ, Ex. 16, Add. H.)  In return, the association would pay Marcus Management a monthly fee.  (Id.)  The Association Management Agreement was to have an initial fifteen year term, with automatic successive renewal terms of five years unless either party canceled ninety days prior to expiration of the Agreement's term.  (Id.)

Under the Hotel Management Agreement, Marcus Management would assume the duties of operating the Platinum's hotel business, including supervising the operation of the commercial units, such as a spa or restaurants, as well as hiring and supervising hotel employees.  (MSJ, Ex. 16, Addendum J.)  Marcus Management also would set the rental rates and market the hotel.  (Id.)  The Hotel Management Agreement contained the following disclaimer:

> Although the Hotel Manager will use commercially reasonable efforts to develop a Marketing Program which will be effective with respect to the operation of the Hotel, no warranty, representation or assurance is made or given that any Marketing Program will in fact be effective in promoting the Hotel or achieving any level of financial results for the Guest Suite Owners or the Association.

(Id.)  As part of its hotel management duties, Marcus Management would "maintain a rotating rental system for each Guest Suite participating in the rental program."  (Id.)  In return for its services, Marcus Management would receive all fees and charges from unit owners under the rental agreements plus all profits generated by the commercial units.  (Id.)  The Hotel Management Agreement was to have an initial fifteen-year term with renewable five-year terms unless either party canceled ninety days prior to expiration of the Agreement's term.  (Id.)

Prospective buyers also received a sample rental agreement "to be entered into by and between an owner of a Unit in the Condominium and the Hotel Manager."  (MSJ, Ex. 16, Add. K.)  Prospective buyers were advised they had the "right (but not the obligation)" to enter into a rental agreement with Marcus Management.  (MSJ, Ex. 2, Add. B.)  However, if prospective buyers elected not to participate in the unit rental program, they would have to pay a monthly fee to the Association in the amount of $750, and this amount was subject to change.  (Id., § 23.)  The $750 per month fee was designed to protect the Hotel Manager from low participation in the rental program, and the fee also was designed to encourage unit owners to opt for the rental program because greater participation was in Marcus Hotels' economic interest.  (MSJ, Ex. 3 at 173, Ex. 37.)

Under the rental agreement, unit owners would appoint Marcus Management as the exclusive rental agent for their individually-owned units.  (MSJ, Ex. 16, Add. K.)  Marcus Management would market and rent out the owners' rooms pursuant to a rotating rental system to allocate rentals among the units participating in the rental program.  (Id.)  Marcus Management and each unit owner would split equally the net rental revenue

generated by the particular unit.  (Id.)  The rental agreement would be in effect for one year with automatic one-year renewals unless either party canceled within ninety days of the expiration of the term.  (Id.)  Prospective buyers were directed to call Hoffman for further information regarding the rental program, and prospective buyers were asked not to direct questions about the rental program to their real estate sales representative as they are "not authorized to discuss with you any aspect of the Rental Program."  (MSJ, Ex. 16, Attach. L.)

Prospective buyers also were provided a document entitled "Platinum Suite Hotel & Spa Projected Room Rate Range."  (MSJ, Exs. 10, 13.)  This document showed projected room rates based on the room type during low and high demand.  (MSJ, Ex. 10.)  For example, the smallest unit was projected to have a rate of $85 per night during low demand, and a rate of $225 during high demand.  (Id.)  The largest unit was projected to have a rate of $135 per night during low demand, and a rate of $575 during high demand.  (Id.)  This document contained the following disclaimer:

> The rates listed above are a range of projected room rates only and may not represent the actual rates charged.  No representation or warranty is made that the listed rates can be achieved.  You are not to rely on them for any purpose.

(Id.)  Marcus Hotels employees Hoffman, Rockwood, and Paul Upchurch ("Upchurch") had advised against providing prospective purchasers the projected room rates, but Otto decided Marcus Hotels would provide projected room rate ranges.  (MSJ, Ex. 3 at 53, Ex. 14 at 204-05, Ex. 18.)  Hoffman, Rockwood, and Upchurch developed the projected room rate ranges.  (MSJ, Ex. 14 at 204-05, Ex. 18.)

The Purchase and Sale Agreement included several disclaimers, including that Platinum Development "makes no representations, warranties or guarantees as to the rental income that the Unit may generate for Buyer, any other aspect of the economic consequences of ownership of the Unit, or the present or future rental market in and about

Las Vegas, Nevada." (MSJ, Ex. 2, Section 22.)  Additionally, Addendum D to the Purchase

and Sale Agreement provided that the prospective buyer acknowledged that--

> no person has made any warranties, representations or assurances
> concerning the economic consequences of ownership of the Unit or
> conditions which may impact on . . . such economic consequences
> (including, by way of illustration, with regard to occupancy rates,
> market condition, including the presence or absence of competition,
> room rental rates, the amount or nature of expenses associated with
> ownership and rental of the Unit or the net income that may be derived
> from ownership of the Unit).

(Id.)  Prospective buyers further acknowledged that "the projected rental rates for the Unit

are based on estimates and that no assurance, guaranty or warranty is made that such rental

rates will in fact be achieved."  (Id.)

The March 2004 packet also included a January 2004 press release from Marcus

Hotels which announced the development of the Platinum.  (MSJ, Exs. 10, 13.)  The press

release described the project, including the amenities and room sizes.  (MSJ, Ex. 10.)  The

press release identified the price range for units as between $300,000 and $1 million, and

stated that the Platinum "will offer a unit rental program for owners who wish to generate

income from the units."  (Id.)

In September 2005, the Platinum's sales agent sent out a postcard advertisement

which stated "Investors Welcome."  (MSJ, Ex. 27.)  In October, Hoffman sent an email to

Mizener, on which he copied Otto and Halfmann.  (Id.)  Hoffman advised Mizener that the

sales agent should "run all future pieces by us first as we are very troubled by 'Investors

Welcome' verbiage on this piece.  We are not selling a security and can not be selling these

as investments as we could get into regulatory trouble.  In addition, during the resale

process, you and the rest of the team need to refrain from using investment in your sales

pitch."  (Id.)

In April 2006, a real estate broker sent an email to Rockwood on behalf of some

clients and inquired if the Platinum had "some projected figures for estimated rental rates,

occupancy levels, visiting and travel history for the strip throughout the year, etc.  They

would like to see what type of numbers they are working with before submitting any offers -

to see if the purchase makes sense." (MSJ, Ex. 17.)  Rockwood responded by directing the

broker to the Las Vegas Convention and Visitors Bureau's website and stated that Platinum

was "unfortunately . . . unable to share any figures with you relative to our hotel specifically

as it must be treated as a separate entity from any real estate transaction." (Id.)  The broker

responded as follows:

> I don't think I understand....Dee Ann from the sales office said that you
> would be able to provide estimates on approximately how much the
> units would rent out for, how often, etc....this information is what my
> clients need in order to calculate what type of cash flow they would be
> looking at if they bought a unit under your Condotel program.  Are you
> saying that this information can not be provided to potential buyers?  If
> so, don't you think that information would be integral in making a
> decision to buy a unit within your property?

(Id.)

Rockwood forwarded this email to Hoffman.  (Id.)  Hoffman responded to

Rockwood that Platinum cannot provide those numbers:

> You can discuss with Bill, but we will be in a pickle in a hurry on this.
> Also, Deanna should not be saying anything about this.  I'm copying
> Tom [Diehl] on this so he can interface with Allison/Deanna as to not
> make any representations in this regard.  Sure hope they have not sold
> this as an investment as we could have even more problems . . . .

(Id.)  Tom Diehl ("Diehl"), a partner in Platinum Development at that time, responded by

assuring Hoffman that the salespersons–

> have never told anyone to get any financial projections from Marcus.
> All that they have done for the past three years is tell the buyers that
> the Marcus Corporation would be managing the Hotel and if they had
> any questions about the company they could contact you, and now
> Peter, for information on the company.  Your standard line has been
> for them to check with the VCB for area statistics.

(MSJ, Exs. 5, 17; Bartelt Decl. at 2.)

///

Rockwood responded that he thought Mizener and Serio "promote the . . .

'opportunity to place their unit in a rental program' as a lead selling proposition to move the

units."  (MSJ, Ex. 17.)  According to Rockwood,

> the buyers [he has] seen or heard come thru the sales office are pretty
> much solely interested in the units generating income and covering
> their nut.  Somehow we need to cut this off at the pass and have
> Allison and Deanna focus more on the selling of the unit as a 'lifestyle'
> and a second/third home as opposed to this great program that will be a
> revenue generator for them.

(Id.)  Diehl responded that while he understood Rockwood's concerns, "the sales staff is

prohibited from selling the units for residency over 30 days as it is not allowed by our

zoning.  Their total focus has been on a combination of owner occupied (when the owners

are in Vegas) and then putting the unit into the rental pool when they are out of town."  (Id.)

Diehl stated he was--

> totally aware that a great many owners have purchased units for the
> sole purpose of receiving a return on them, either from the rental pool,
> resale or a combination of both.  We have all known since the
> beginning of this project that the units would not cash flow from
> strictly a rental stand point.  We all hope that the hotel operation will
> exceed our projections; however we can not discuss any of that
> material with the buyers.

(Id.)

## C.  The 2006 Public Offering Statement

In December 2006, in anticipation of impending closings on the unit sales,

Platinum sent buyers another packet which contained a cover letter, a revised Public

Offering Statement, and other enclosures (collectively, the "2006 POS").  (MSJ, Ex. 28.)

The cover letter identified some differences between the 2004 POS and the 2006 POS.  (Id.)

The letter identified the "biggest change" as being related to the area comprising the

"Common Elements," those portions of the property owned in common by all unit owners.

(Id.)  In the 2006 POS, virtually all of the areas that previously were General Common

Elements became Commercial Elements, and thus would be under control of the Hotel

Owner, Platinum Development, rather than the unit owners.  (Id.)

The 2006 POS also eliminated the Hotel Management Agreement, instead vesting control over the Commercial Elements in Platinum Development.  (Id.)  Many of the terms of the former Hotel Management Agreement were incorporated into the Covenants, Conditions and Restrictions ("CC&Rs"), and Platinum Development could delegate its duties to the Hotel Manager, Marcus Management.  (Id.)  Additionally, the 2006 POS indicated that due to changes in Nevada law, an affiliate of Platinum Development no longer would be able to provide association management services.  (Id.)

The 2006 POS contained many of the same features as the 2004 POS, including that a unit could not be used as a primary residence; that a unit could not be occupied for a consecutive period of 30 days; that unit owners could, but did not have to, participate in the rental program; and that if they did not participate in the rental program, they would be charged a monthly fee of $750.  (Id.)  The CC&Rs set forth the terms of hotel management, including that Platinum Development would establish room rental rates and hotel operation practices, and that owners who did not participate in the rental program would have to pay a monthly fee of $750 which could be increased "in the Hotel Owner's sole discretion." (MSJ, Ex. 28, Attach. D.)  Platinum Development would be obligated to develop, implement, and pay for a marketing program for the hotel.  (Id.)

Attached to the 2006 POS was a sample rental agreement.  (MSJ, Ex. 28, Attach. J.)  The sample agreement largely reflected the same terms as the rental agreement attached to the 2004 POS, including that Marcus Management would undertake efforts to market the hotel, and would perform all operational duties of the hotel, such as hiring employees, establishing rental rates, and using a rental rotation program to "fairly allocate rentals for each room within a given room category."  (Id.)  The sample rental agreement also contained the following disclaimer:

///

1
2
3
4

> Although the Hotel Manager will use commercially reasonable efforts to develop a marketing program which will be effective with respect to the operation of the hotel, no warranty, representation or assurance is made or given that any marketing program will in fact be effective in promoting the hotel or achieving any level of financial results for the owner or the association.

5
(Id.)

6
7
8
9
10
11
12
13
14
15
16

In an email dated February 27, 2007, Mizener advised Hoffman that a potential purchaser "wants examples of 2-3 units income stream from the start of the rental program. . . . We will need that rental revenue information now on a regular basis." (MSJ, Ex. 19 at 323, Ex. 20.)  Hoffman advised Mizener that Marcus Hotels would "not be providing any figures on rental income as this could put us in breach of SEC rules and I don't look good in an orange jumpsuit." (MSJ, Ex. 20.)  Mizener responded by suggesting that once current owners had a revenue stream, the salespersons could get that type of information from the owners because it "then becomes history instead of projection." (Id.)  Hoffman wrote Mizener back to tell her that Marcus and Platinum would not release this information to prospective buyers "even if it is history vs. a projection and we don't want . . . our agent to either." (Id.)

17
18
19
20
21
22
23
24
25

In November 2007, the Platinum prepared a letter to send to owners who opted out or were thinking of opting out of the rental program.  (MSJ, Ex. 4.)  The letter advised owners that no one, including the owner, could occupy the unit for more than twenty-nine consecutive days.  (Id.)  The letter also advised owners that reservations nevertheless must be made through the Platinum even if the unit was not in the rental program.  (Id.)  The letter detailed various charges associated with the unit when not in the rental program, including between $30 and $50 per day for daily housekeeping fees, a $75 "departure service" fee, $25 for additional bedding or linen, and $750 per month to cover various services such as the front desk, concierge, valet, fitness center, and security.  (Id.)

26
///

**D.  Post-Closing**

Of the 237 units sold, at least 233 were involved in the rental program.  (MSJ, Ex. 5 at 27.)  The rental program generally had a 95% participation rate since it opened in 2006.  (MSJ, Ex. 5 at 27, Ex. 33 at 27.)  However, not all unit owners participated in the rental program, and some rented out their units without going through Marcus Management's rental program.  (Defs.' Opp'n, Exs. 44-45.)  Several original owners sold their units for a profit.  (Defs.' Opp'n, Exs. 48-50, 90, 94, 96, 98, 100, 104, 106.)  Nevertheless, many Plaintiffs stated in their depositions that the sales force pitched to them the potential for income generation through the rental program, and that the rental program was a substantial contributing factor in their decision to purchase units at the Platinum.  (MSJ, Ex. 32.)

It is undisputed that Defendants did not register a security in relation to the offer and sale of units at the Platinum.  The parties dispute only whether the sale of the units combined with the rental agreements constitute "investment contracts" such that Defendants were required, under Nevada law, to register them as securities prior to their offer and sale.  The parties also dispute whether Plaintiffs' claim that Defendants failed to register a security is untimely under the applicable statute of limitations.  Finally, the parties dispute whether Marcus Hotels has control person liability.

## II.  DISCUSSION

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th

Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

**A.  Security**

Plaintiffs move for partial summary judgment on counts fifteen, sixteen, and seventeen on the issue of whether Defendants sold a security.  Plaintiffs argue that because they invested money in a common enterprise through which they expected profits based on Defendants' efforts, Defendants sold a security by offering the sale of the units combined with a rental agreement.  Defendants oppose Plaintiffs' Motion, and counter-move for summary judgment on these claims.  Defendants argue they did not sell a security because Nevada condominium law displaces Nevada securities law,  the real estate sale and the rental agreement were not part of a single transaction, there was no common enterprise, and Plaintiffs maintained control over their investment such that they did not expect profits based on Defendants' efforts.  Defendants also argue that even if they sold a security, Plaintiffs' failure-to-register claim in count fifteen is time barred.

Nevada law makes it unlawful to sell or offer to sell an unregistered security in the State.  Nev. Rev. Stat. § 90.460.  A "security" includes an "investment contract."  Id. § 90.295.  An interest in a common-interest community, such as a condominium, is not a security under Nevada law.  Id. § 116.4107.  However, Nevada has not addressed whether an interest in a condominium combined with a rental agreement constitutes an investment contract governed by Nevada securities laws.  Nevada looks to federal securities law for guidance on what constitutes a security because Nevada law defines a security in similar fashion as the Securities Act of 1933 and the Securities Exchange Act of 1934.  15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10); State v. Friend, 40 P.3d 436, 439-40 (Nev. 2002).

The federal securities statutes do not define what constitutes an investment contract. However, in light of the "statutory purpose of compelling full and fair disclosure relative to the issuance of the many types of instruments that in our commercial world fall within the ordinary concept of a security," courts disregard form and evaluate the economic realities of the subject transaction. S.E.C. v. W.J. Howey Co., 328 U.S. 293, 299 (1946) (quotation omitted). The analysis therefore is "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Id.

An investment contract thus has been defined as a "contract, transaction or scheme whereby a person" (1) invests money (2) in a "common enterprise" and (3) "is led to expect profits solely from the efforts of the promoter or a third party." Id. at 298-99 (the "Howey test"). In making this evaluation, the written contract does not control. Hocking v. Dubois, 885 F.2d 1449, 1457 (9th Cir. 1989) (en banc). Rather, the Court looks at "those items a broker was legally authorized to offer an investor," including "[p]romotional materials, merchandising approaches, oral assurances and contractual agreements." Id. (quotation omitted). The inquiry is an objective one "based on what the purchasers were led to expect." Warfield v. Alaniz, 569 F.3d 1015, 1021 (9th Cir. 2009) (quotation omitted).

 The sale of real estate ordinarily does not involve an investment contract because securities laws do not apply when "a purchaser is motivated by a desire to use or consume the item purchased," such as by occupying the real estate or developing it himself. United Hous. Found., Inc. v. Forman, 421 U.S. 837, 852-53 (1975). However, the sale of real estate may constitute the sale of a security when related services are provided either by the real estate promoter or a related entity. Howey, 328 U.S. at 300-01. "Although characterization of a transaction raises questions of both law and fact, the ultimate issue of whether or not a particular set of facts, as resolved by the factfinder, constitutes an

investment contract is a question of law." <u>United States v. Carman</u>, 577 F.2d 556, 562 (9th Cir. 1978).

The parties do not dispute that Plaintiffs invested money when they purchased the units. <u>See</u> <u>Warfield</u>, 569 F.3d at 1021 (stating the investment of money "requires that the investor commit his assets to the enterprise in such a manner as to subject himself to financial loss." (quotation omitted)). The parties dispute whether Nevada law on the sale of condominiums displaces Nevada securities law. The parties also dispute whether the sale of the units and the offer of the rental program were part of the same transaction or scheme, whether the investment was in a common enterprise, and whether purchasers expected profits produced by others' efforts.

### 1. Nevada Condominium Law

In their Countermotion, Defendants argue Nevada's statutory requirements for the sale of condominiums constitute a comprehensive regulatory scheme which makes application of Nevada's securities laws unnecessary to protect the public. Plaintiffs respond there is no legal authority for the proposition that Nevada statutory law regarding condominiums was intended to displace Nevada securities law. Plaintiffs further argue that condominium law does not speak to the sale of a condominium coupled with a rental agreement.

Nevada law requires the preparation of a public offering statement before offering a condominium unit for sale to the public as part of a common promotional plan. Nev. Rev. Stat. §§ 116.4102(1), .035. The public offering statement must include information such as a description of the common-interest community, copies of the bylaws, certain financial information, certain fee information, and any restraints on the leasing or renting of units. <u>Id.</u> § 116.4103. Nevada imposes liability for any false or misleading statement or omission in connection with the public offering statement. <u>Id.</u> § 116.4102(3), .4117. If the interest is registered with the Securities and Exchange Commission or certain

Nevada regulatory authorities, these requirements may be met by delivering to the prospective buyer a copy of the public offering statement filed with the Securities and Exchange Commission or the appropriate Nevada regulatory authority.  Id. § 116.4107.

Nothing in the Nevada statutory structure suggests that Chapter 116 was intended to, or has the effect of, superceding a finding that a condominium unit combined with a rental agreement is a security.  Rather, § 116.4107 suggests that Nevada law anticipates there may be situations where an interest in a common-interest community will be registered as a security.  Moreover, the authority upon which Defendants rely to argue that a comprehensive regulatory scheme makes application of securities laws unnecessary does not apply to the test for determining whether a particular transaction or scheme is an investment contract.  See Reves v. Ernst & Young, 494 U.S. 56, 64, 66-67 (1990) (rejecting the use of the Howey test to determine when a "note" is a security, and instead adopting a four-part test which includes consideration of whether another regulatory scheme exists which would make application of securities laws unnecessary); S.E.C. v. Wallenbrock, 313 F.3d 532, 536-37 (9th Cir. 2002) (applying the Reves test to determine if a note was a security).  The Court therefore will deny Defendants' Countermotion on this basis.

### 2.  Single Transaction

In their Countermotion, Defendants argue that given the lapse of time between when prospective buyers signed the purchase agreements prior to the Platinum being constructed and when they signed the rental agreements after the Platinum opened, the real estate sale and the rental agreement were separate transactions, and thus do not amount to the sale of an investment contract.  Plaintiffs respond that there is no significant time lapse because the 2006 POS was issued contemporaneously with the closings on the units and owners entering into the rental agreements in 2006 and 2007.  Plaintiffs also contend that the rental agreements were presented in both the 2004 POS and 2006 POS as part of the sale of the condominium units, and any delay between signing the two agreements is

explained by the fact that the Platinum had to be constructed before any units could be rented.

Congress' purpose in enacting the securities laws "was to regulate investments, in whatever form they are made and by whatever name they are called." McNabb v. S.E.C., 298 F.3d 1126, 1131 (9th Cir. 2002) (emphasis and quotation omitted).  Thus, application of securities laws cannot be avoided by breaking up a transaction or scheme into a series of purportedly separate agreements.  Hocking, 885 F.2d at 1457 (noting that a security may exist even if it is not in "one neat, tidy certificate," but instead consists of a "general 'scheme' of profit seeking activities").  Rather, the Court must view the transaction or scheme "in its entirety in determining whether it is within or without the Act." Carman, 577 F.2d at 564 (quotation omitted).

Viewing the evidence in the light most favorable to Defendants on Plaintiffs' Motion for Partial Summary Judgment, no genuine issue of material fact remains that the sale of the units with the rental agreement was a single transaction.  The rental program was included in the promotional materials from the inception.  The 2004 and 2006 Offers advised unit owners they would have the option of putting their units in a rental program and included a sample rental agreement.  Any substantial gap in time between the purchase agreement and the rental agreement was a function of the fact that the Platinum had to be constructed before any unit owner could purchase and subsequently rent out a unit.

More importantly, the rental program was tied to ownership of a unit even if a unit owner opted not to participate because unit owners would have to pay a $750 monthly fee if they opted out of the rental program.  This fee was incorporated into the CC&Rs, and thus was a feature of the real estate transaction, not just the rental agreement, and inextricably ties the two agreements together.  The rental program thus was not an entirely separate transaction, nor was it presented to purchasers as such.  Rather, it was part and parcel of the offer of the sale of the units, regardless of whether a unit owner opted to

participate in it.  The Court therefore will grant Plaintiffs' Motion for Partial Summary Judgment to the extent that no genuine issue of material fact remains that the sale of the units and the rental agreements constituted a single transaction.  The Court will deny Defendants' Countermotion on this basis.

### 3.  Common Enterprise

Plaintiffs contend the sale of the units at the Platinum constituted a common enterprise because the unit owners shared costs, the rooms were rented through a rotation system to ensure an even distribution of rental revenue, and unit owners depended on Marcus Management's operation of the hotel to successfully rent out their rooms.  Plaintiffs also contend a common enterprise existed because Marcus Management and individual unit owners split the profits from the rental of each unit.

Defendants respond and countermove on the basis that there is no common enterprise because there is no pooling of revenues among unit owners.  Instead, each unit owner is entitled only to the revenue generated by his or her individual unit.  Defendants further contend unit owners' success was not tied to Marcus Management's success because there were many ways for unit owners to profit without participating in the rental program, including selling their units, renting their units themselves, or using a third party manager to rent their units.

A common enterprise may exist either where there is "an enterprise common to the investor and the seller, promoter or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality)."  Hocking, 885 F.2d at 1455.  A plaintiff may show vertical commonality if "the fortunes of the investors are linked with those of the promoters."  S.E.C. v. R.G. Reynolds Enters., Inc., 952 F.2d 1125, 1130 (9th Cir. 1991) (quotation omitted); see also S.E.C. v. Eurobond Exch., Ltd., 13 F.3d 1334, 1338-39 (9th Cir. 1994) (stating "a common enterprise exists if a direct correlation has been established between success or failure of [the promoter's] efforts and success or

failure of the investment") (quotation omitted). "One indicator of vertical commonality, though by no means the only indicator, is an arrangement to share profits on a percentage basis between the investor and the seller or promoter." <u>R.G. Reynolds</u>, 952 F.3d at 1130-31 (holding that where promoter's management fee was based on a percentage of the profits, promoter's profit was tied to investors' profits, and thus vertical commonality existed).

Viewing the evidence in the light most favorable to Defendants on Plaintiffs' Motion for Partial Summary Judgment, no genuine issue of material fact remains that vertical commonality existed between the promoter and the unit owners. Marcus Development owned Platinum Development and Marcus Management. Marcus Management, as the operator of the hotel, was entitled to a fifty-fifty split in rental profits with each unit owner. Thus, Marcus Management's profits were tied to the success or failure of each unit owner's ability to realize rental revenue for their individual units, which in turn were tied to Marcus Management's success or failure in marketing and operating the hotel. Marcus Management's success or failure also was tied to the overall participation of the unit owners in the rental program. As Otto testified, the fees for not participating in the rental program were designed in part to incentivize unit owners to participate because owner participation was in Defendants' economic interest. The Court therefore will grant Plaintiffs' Motion for Partial Summary Judgment to the extent that no genuine issue of material fact remains that a common enterprise exists through vertical commonality. The Court will deny Defendants' Countermotion on this basis.

### 4. Efforts of Others

Plaintiffs argue they purchased the units as passive investments with the expectation of rental revenue generated by Marcus Management's efforts in running the hotel. Plaintiffs contend the units were marketed as investment vehicles through which Plaintiffs could expect a return based on the expertise of Marcus Hotels in running a hotel. Plaintiffs argue the restrictions on use and fees for nonparticipation in the rental program

establish that the owners lacked control over their units as a practical matter, even if participation in the rental program was not mandatory.  Plaintiffs argue they cannot each run a one-room hotel, and this demonstrates they were passive investors in Defendants' hotel.

Defendants respond by arguing Plaintiffs are sophisticated investors who retained substantial control over their units.  Defendants contend the rental program was voluntary and Plaintiffs retained the options of selling their units, occupying their units (so long as they did not occupy them more than twenty-nine consecutive days at a time), or renting out the units themselves or through a third party agent.  Defendants argue that once it is established that unit owners exercised control over their units, it is irrelevant whether Defendants marketed the units as an investment opportunity.

The third prong of the Howey test whether the prospective buyer "is led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. at 298-99.  Although Howey describes the third prong of the investment contract test as expecting profits derived "solely" from the promoter's or a third party's efforts, courts require only that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  Hocking, 885 F.2d at 1455 (quoting S.E.C. v. Glenn W. Turner Enters., 474 F.2d 476, 482 (9th Cir. 1973)).  This "inquiry is not directed to what actually transpires after the investment is made, i.e., whether the investor later decides to be passive or to delegate all powers and duties to a promoter or managing partner."  Koch v. Hankins, 928 F.2d 1471, 1477 (9th Cir. 1991).  Rather, the plaintiff must show the "reliance on the manager which forms the basis of the partner's expectations was an understanding in the original transaction."  Id. (emphasis and quotation omitted).

Whether the rental agreement was mandatory or optional is not dispositive of the question.  Howey, 328 U.S. at 300-01; Hocking, 885 F.2d at 1460.  Where an investor has

the legal ability to control the investment, a security still may be found if the investor shows he is dependent as a practical matter, in that he is unable to "exercise meaningful powers of control or to find others to manage his investment." Hocking, 885 F.2d at 1460. An investor may establish an inability to exercise control by showing:

> (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

Id. (quoting Williamson v. Tucker, 645 F.2d 404, 424 (5th Cir. 1981)). In making this determination, the Court considers the applicable agreements, any other documents which structure the investment, any promotional materials, the promoter's oral representations, the investor's experience and knowledge, the promoter's managerial skill, and the investor's practical ability to exercise powers possessed by virtue of the agreements. S.E.C. v. Rubera, 350 F.3d 1084, 1093 (9th Cir. 2003); Koch, 928 F.2d at 1478.

The Court in Hocking applied the third Williamson factor, the investor's dependency on the promoter or manager, as the "closest fit" for determining an investor's ability to exercise control over an investment in a condominium operated as a hotel involving a rental agreement. Hocking, 885 F.2d at 1461. In Hocking, as here, the plaintiff invested in a unit in a resort condominium operated as a hotel, where participation in the rental agreement was optional. Id. at 1456, 1461. In Hocking, the investors pooled their units, and a unit owner could not remove the rental manager without 75 percent of participating investors voting for removal. Id. at 1461. The United States Court of Appeals for the Ninth Circuit concluded "[t]hese facts alone" raised an issue of fact as to whether unit owners lacked the ability to control their investment because they were "stuck with" the rental manager. Id. The Ninth Circuit further noted that a residential condominium rented

out to long-term tenants is different than a hotel which rents rooms one or two nights at a time.  Id.  Operating a hotel which solicits guests and charges nightly rates for short-term stays--

> may be a much more difficult service to replace than that of a long-term leasing agent.  The commercial viability of a one-room hotel does not strongly argue for separate management.  The individual investor may have no choice but to place his condominium in the rental pool, if he is to receive significant rental income.

Id.  The Ninth Circuit thus concluded that genuine issues of material fact remained as to the plaintiff's ability to manage his investment.  Id. at 1461-62.

Here, unit owners had even less ability to control their investments than the plaintiff in Hocking.  Unit owners did not pool their units, but Marcus Management implemented a rental rotation system intended to fairly allocate rentals among comparable units in the program.  Unlike the plaintiff in Hocking, unit owners had no mechanism through which they could remove Marcus Management as the rental agent for the hotel's rental program.  If owners opted to participate in the rental program, they were stuck with Marcus Management.  The only way an owner could avoid Marcus Management was by opting out of the rental program altogether.

Although a handful of unit owners opted out, that does not raise an issue of fact as to control.  In Howey, the Supreme Court concluded that sales of small tracts of land in a citrus grove combined with an optional service contract for cultivating the grove were investment contracts.  328 U.S. at 300-01.  This conclusion was "unaffected by the fact that some purchasers [chose] not to accept the full offer of an investment contract by declining to enter into a service contract with the [promoter's affiliated company]."  Id.  This result is particularly appropriate here because opting out of Marcus Management's rental program subjected unit owners to various fees, including a $750 monthly fee which was subject to being raised at any time in Defendants' sole discretion to ensure adequate unit owner participation in the rental program.  Due to the high unit owner participation rate,

Defendants did not have to employ the control tool at their disposal.  However, under the relevant agreements, Defendants had the legal and practical ability to control unit owner participation by raising the monthly fee for non-participants.  The undisputed evidence demonstrates this fee was designed both to ensure adequate protection for Platinum Development and also to encourage unit owner participation in the rental program because it was in Defendants' economic interest for unit owners to participate.

Practically speaking, unit owners were dependent on Defendants marketing and operating a hotel to generate revenue for their individual units.  Defendants marketed, and Plaintiffs testified they expected, interests in a boutique hotel run by an expert in the hotel business.  It is appropriate that Defendants' offers "be judged as being what they were represented to be."  Hocking, 885 F.2d at 1458 (quotation omitted).  Defendants' boilerplate disclaimers in their marketing materials do not trump the economic realities of the transaction when the applicable agreements, promotional materials, and structure of the sale and rental scheme are considered as a whole.

The primary case upon which Defendants rely, Alunni v. Development Resources Group, LLC, is of persuasive value only and is distinguishable.  In Alunni, condominium unit owners took title to the units subject only to existing leases.  445 F. Appx. 288, 296 (11th Cir. 2011).  There were no restrictions on the unit owner occupying the unit or leasing the unit, either themselves or through a third party, following a one-year exclusive arrangement with a property management company selected by the promoter.  Id.  During the one-year exclusive arrangement, purchasers' rental income was guaranteed even if their unit became unoccupied.  Id.  The United States Court of Appeals for the Eleventh Circuit concluded that the plaintiffs' success was not dependent on the efforts of third parties "because once the plaintiffs' rent was no longer guaranteed, they were free to control their units themselves."  Id. at 296.

///

Here, unlike <u>Alunni</u>, the 29-day restriction on occupation of the units ensured only short term use of a unit in conformity with the intended operation of the Platinum as a hotel.  This restriction was a permanent feature of the investment whereas in <u>Alunni</u>, any restrictions on owner use were temporary.  More importantly, <u>Alunni</u> did not involve any structural mechanism like the fee for non-participation in the rental program which Defendants may adjust to ensure adequate unit owner participation in Marcus Management's rental program at their discretion in perpetuity.  Consequently, no genuine issue of material fact remains that unit owners lacked the practical ability to control their investment, and the third prong of the <u>Howey</u> test is satisfied.

No genuine issue of material fact remains that Nevada condominium law does not supercede Nevada securities law, and the real estate sale and rental agreement were part of a single transaction.  Further, no genuine issue of material fact remains that Plaintiffs invested money in a common enterprise and were led to expect profits based on Defendants' efforts.  The Court therefore will grant Plaintiffs' Motion for Partial Summary Judgment on the issue of whether Defendants sold an unregistered security, and will deny Defendants' Countermotion on this issue.

## B.  Statute of Limitations

In their Countermotion, Defendants argue that even if they sold a security, Plaintiffs' claims in count fifteen is untimely under the applicable statute of limitations because Plaintiffs knew or should have known that any such security was unregistered at the time they purchased the units in 2006 or 2007.  Plaintiffs respond that the limitations period is subject to the discovery rule, and it is a question of fact when the limitations period began to run for each Plaintiff.  Plaintiffs also argue Defendants should be judicially estopped from making this argument because in a related case in this District, Defendants argued that a class action was inappropriate due to the individualized inquiries that would be required on the statute of limitations defense.

### 1.  Nevada Revised Statutes § 90.670

Count fifteen of the Third Amended Complaint asserts that Defendants issued unregistered securities and, pursuant to Nevada Revised Statutes § 90.660, Plaintiffs are entitled to recover the amount they paid for the securities.  (Third Am. Compl. at 46-59.) In their Countermotion, Defendants argue that even if the Court finds genuine issues of material fact remain that Defendants sold unregistered securities, count fifteen is untimely under the applicable statute of limitations.  Defendants contend the discovery rule does not save count fifteen because Plaintiffs discovered, or should have discovered, they purchased unregistered securities at the time they executed the purchase agreements.

Plaintiffs respond that Nevada statutory law specifically sets forth a discovery rule for registration claims, and thus it cannot be the case that a plaintiff always can discover the fact that the offering is not a registered security at the time the purchase agreement is executed.  Plaintiffs also contend this Court previously rejected Defendants' prior motion to dismiss on this basis.  Plaintiffs argue it is a question of fact as to when each Plaintiff discovered or should have discovered the violation, a position which Defendants successfully urged to defeat class certification in a related case pending in this District.  Plaintiffs thus contend Defendants should be judicially estopped from arguing discovery is anything other than an individualized factual inquiry.

Pursuant to Nevada Revised Statutes § 90.660(1), a person who commits certain securities violations, including the sale of unregistered securities, is liable to the person purchasing the security.  A "sale" of a security "includes every contract of sale, contract to sell, or other disposition, of a security or interest in a security for value."  Nev. Rev. Stat. § 90.280.  A claim under § 90.660 must be brought within the earliest of five years after the act, omission, transaction constituting the violation; two years after the plaintiff discovered the violation; or two years after the plaintiff should have discovered the violation in the exercise of reasonable care.  Id. § 90.670.

Whether a plaintiff has exercised reasonable care generally is a question of fact. Bemis v. Estate of Bemis, 967 P.2d 437, 440-41 (Nev. 1998).  However, the issue may be decided as a matter of law if the "uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the facts giving rise to the cause of action."  Id. at 440 (quotation omitted).  The "focus is on the [plaintiff's] knowledge of or access to facts rather than on her discovery of legal theories."  Massey v. Litton, 669 P.2d 248, 252 (Nev. 1983).

Viewing the evidence in the light most favorable to Plaintiffs, no genuine issue of material fact remains that Plaintiffs' claims in count fifteen are untimely.  Plaintiffs knew all facts giving rise to their failure to register claims no later than when they signed their purchase agreements in 2006 and 2007.  Plaintiffs allege in the Third Amended Complaint, and testified at their depositions, that Defendants were marketing an investment.  The securities' status as registered or unregistered was publicly available information capable of discovery through reasonable care.  See Nev. Rev. Stat. § 90.730.  Plaintiffs therefore had all facts necessary to bring their registration claims at the time they signed their purchase agreements, even if they did not understand the legal significance of those facts until later. See, e.g., Perry H. Bacon Trust v. Transition Partners, Ltd., 298 F. Supp. 2d 1182, 1192 (D. Kan. 2004) ("Here, it is evident that if plaintiffs had exercised reasonable diligence, they could have learned that the securities were not registered by checking the Kansas Securities Commissioner's office."); Blatt v. Merrill Lynch, Pierce, Fenner & Smith Inc., 916 F. Supp. 1343, 1353 (D.N.J. 1996) (stating "the seller of securities cannot conceal the fact that the securities he sells are not registered").

### 2.  Judicial Estoppel

In their Opposition to Defendants' Countermotion, Plaintiffs argue Defendants should be estopped from arguing Plaintiffs discovered, or should have discovered, their registration claims at the time they signed their purchase agreements because Defendants successfully argued in a related case that the statute of limitations inquiry was

individualized and therefore weighed against class certification.  Defendants respond that they did not take inconsistent positions in the two cases and the Court did not rely on Defendants' statute of limitations argument to deny class certification.

In a related case in this District against the same Defendants in this action, Goodman v. Platinum Condominium Development, LLC, 2:09-CV-00957-KJD-PAL, Defendants moved to dismiss, raising the same statute of limitations defense as presented here, among other issues.  (Goodman, 2:09-CV-00957-KJD-PAL, Mot. to Dismiss (Doc. #13) at 18.)  The Court denied that motion as to the statute of limitations.  (Goodman, 2:09-CV-00957-KJD-PAL, Order (Doc. #30) at 13.)  The Goodman plaintiffs thereafter filed a motion to certify a class, which Defendants opposed.  Defendants noted the Court previously had rejected Defendants' statute of limitations argument at the dismissal stage. Defendants then argued that the Goodman plaintiffs' "own assertion of the discovery rule invokes individualized determinations," making the case inappropriate for class treatment. (Goodman, 2:09-CV-00957-KJD-PAL, Defs.' Resp. to Pls.' Mot. for Class Certification (Doc. #61) at 20-21.)  Defendants thus argued that  (Id. at 21.)  The Court denied the motion to certify, stating that while denying certification on the statute of limitations issue alone was inappropriate, it was a factor for the Court to consider on whether proceeding on a class basis was superior to individualized actions.  (Goodman, 2:09-CV-00957-KJD-PAL, Order (Doc. #94) at 10-11.)

Judicial estoppel is an equitable doctrine aimed at preventing litigants from "'playing fast and loose' with the courts by taking one position, gaining advantage from that position, then seeking a second advantage by later taking an incompatible position."  United Nat'l Ins. Co. v. Spectrum Worldwide, Inc., 555 F.3d 772, 778 (9th Cir. 2009).  The doctrine applies where the litigant takes inconsistent positions in two different cases.  Id. To invoke judicial estoppel, (1) the litigant's position must be "clearly inconsistent" with its prior position, (2) the court must have accepted the prior position such that accepting the

litigant's current position "would create the perception that either the first or the second court was misled," and (3) the litigant would obtain "an unfair advantage if not estopped." Id. at 779 (quotations omitted).

The Court will not judicially estop Defendants because they have not taken clearly inconsistent positions.  Defendants consistently have argued in this litigation and in Goodman that the plaintiffs' registration claims in both cases are untimely because each plaintiff knew the facts supporting the claims at the time they purchased the units.  In opposing the class certification motion in Goodman, Defendants argued only that if the plaintiffs were correct that the discovery rule could save their claims, then class certification was inappropriate because that would require individualized determinations.  Having failed to convince the Court that the claims were time-barred at the dismissal stage, Defendants consistently could argue that individualized factual determinations regarding the discovery rule cast doubt upon class treatment and also assert at summary judgment in this case that no genuine issue of material fact remains that Plaintiffs discovered or should have discovered the existence of their claims when they signed their purchase agreements.  The Court therefore will grant Defendants' Countermotion as to count fifteen.

### C.  Control Person

Count seventeen of the Third Amended Complaint alleges Defendant Marcus Hotels is liable because it controlled primary securities law violators Platinum Development and Marcus Management.  Plaintiffs move for summary judgment on Marcus Hotels' status as a control person, arguing Marcus Hotels is the sole member of Platinum Development and Marcus Management, Marcus Hotels employees created the projected room rate ranges, and Marcus Hotels' president decided to provide the room rate projections to prospective buyers.  Plaintiffs contend no genuine issue of material fact remains that Marcus Hotels decided what would be done with respect to the Platinum.  Defendants oppose and countermove for summary judgment on this issue, arguing Plaintiffs have cited inapplicable

authority and have failed to show Marcus Hotels exercised day-to-day control over any primary violator.  Plaintiffs reply and oppose Defendants' Countermotion by arguing that Marcus Hotels and Marcus Corporation made the decision not to register the Platinum offering as a security, and thus control person liability is appropriate.

Pursuant to Nevada Revised Statutes § 90.660(4), a person who "directly or indirectly controls" a primary violator of Nevada securities law is jointly and severally liable for the securities violation.  The Nevada Administrative Code defines a control person as a person who:

1. Owns or controls 10 percent or more of the voting stock of a corporation;
2. Is an officer or director of a corporation; or
3. Is in a position to influence the decision-making processes of a corporation.

Nev. Admin. Code § 90.035.

No genuine issue of material fact remains that Marcus Hotels is a control person for Defendants Platinum Development and Marcus Management.  Marcus Hotels, through its wholly-owned subsidiary Marcus Development, owned over 10 percent of Platinum Development and Marcus Management from each company's inception, and eventually wholly owned both companies.  Plaintiffs also have presented evidence that Marcus Hotels not only was in a position to influence Platinum Development's decision-making process but actually made important decisions for Platinum Development, including what materials to provide prospective buyers and whether to register the Platinum offering as a security. (Pls.' Opp'n to Defs.' Countermot. Summ. J. (Doc. #180), Ex. 39 at 33-34.)  The Court therefore will grant Plaintiffs' Motion for Partial Summary Judgment and will deny Defendants' Countermotion on this issue.

**III.  CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Leave to File Response to Motion for Partial Summary Judgment and Countermotion in Excess of Page

Case 2:09-cv-00671-PMP-GWF   Document 229   Filed 07/11/12   Page 31 of 31

Limit (Doc. #150) is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment (Doc. #136/#138) is hereby GRANTED.

IT IS FURTHER ORDERED that Defendants Platinum Condominium Development, LLC; Marcus Management Las Vegas, LLC; and Marcus Hotels, Inc.'s Countermotion for Partial Summary Judgment (Doc. #160) is hereby GRANTED in part and DENIED in part.  The motion is granted to the extent that count fifteen of the Third Amended Complaint is dismissed as barred by the applicable statute of limitations.  The motion is denied in all other respects.


DATED:  July 10, 2012

_____
PHILIP M. PRO
United States District Judge