UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ION BAROI, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATINUM CONDOMINIUM DEVELOPMENT, LLC; MARCUS HOTELS, INC.; and MARCUS MANAGEMENT LAS VEGAS, LLC,<br><br>    Defendants. | 2:09-CV-00671-PMP-GWF<br><br>ORDER |

        Presently before the Court is Defendants' Motion for Partial Summary Judgment Against Claims Sounding in Fraud (Doc. #164), filed on December 23, 2011. Plaintiffs filed an Opposition (Doc. #206/#211) on February 18, 2012. Defendants filed a Reply (Doc. #219) on March 9, 2012. Defendants filed a Notice of Supplemental Authority (Doc. #221) on April 17, 2012. Plaintiffs filed a Response (Doc. #223) on May 4, 2012.

        This case arises out of Plaintiffs' purchases of condominium units in Defendant Platinum Condominium Development, LLC's ("Platinum Development") condo/hotel project, the Platinum, located in Las Vegas, Nevada. The Platinum hotel was run by Defendant Marcus Management Las Vegas, LLC ("Marcus Management"). Plaintiffs brought suit in Nevada state court in March 2009, and Platinum Development removed the action to this Court. (Pet. for Removal (Doc. #1).) Among the various claims Plaintiffs assert against Defendants are fraudulent misrepresentation (count two), negligent misrepresentation (count three), fraud in the inducement (count four), fraudulent concealment (count five), violation of Nevada Deceptive Trade Practices Act (count 7),

rescission based on fraud (count eight), violation of Interstate Land Sales Full Disclosure Act (count 14), and violation of Nevada securities laws (counts 15-17). (Third Am. Compl. (Doc. #89).) The parties refer to these claims collectively as Plaintiffs' fraud-based claims.

The Court set forth the factual background in this matter in a separate order filed this date. The Court will not repeat the facts here except where necessary to resolve the present motions.

Defendants move for summary judgment on Plaintiffs' fraud-based claims. Defendants argue that statements about future performance are not actionable as fraud absent evidence Defendants had no intent to perform in the future, and Plaintiffs present no such evidence here. Defendants also contend mere puffery is not actionable as fraud and most statements about which Plaintiffs complain are puffery. Defendants also contend some statements were factually true, particularly regarding condominium unit sizes and Defendant Marcus Hotels, Inc.'s ("Marcus Hotels") expertise and experience. Finally, Defendants argue no special relationship existed between Defendants and Plaintiffs triggering a duty to disclose, and thus no fraudulent concealment claim will lie against Defendants in this action.

Plaintiffs respond that when properly considered, Defendants' statements are not future projections or puffery, but rather are misstatements of then-existing material facts about the project. Alternatively, Plaintiffs contend issues of fact remain as to whether Defendants intended to perform. Plaintiffs further contend the statements regarding unit size were false. Plaintiffs argue a special relationship existed because Plaintiffs relied on Marcus Hotels' expertise, and because Defendants possessed undisclosed facts in the form of internal projections which differed from what Defendants marketed to Plaintiffs, and which Plaintiffs could not obtain themselves. Finally, Plaintiffs argue Defendants should be collaterally estopped from disputing that they failed to evaluate the Las Vegas market, and thus they had no reasonable basis to make these representations.

## I. LEGAL STANDARD

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). Initially, the moving party bears the burden of proving there is no genuine issue of material fact. Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002). After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial. Id. The Court views all evidence in the light most favorable to the non-moving party. Id.

## II. DISCUSSION

Plaintiffs' fraud-based claims in counts 2-4, 7-8, and 14-17 require Plaintiffs to prove Defendants made a false statement. See Bulbman, Inc. v. Nev. Bell, 825 P.2d 588, 592 (Nev. 1992) (fraud); Barmettler v. Reno Air, Inc., 956 P.2d 1382, 1386-87 (Nev. 1998) (fraudulent inducement and negligent misrepresentation); Nev. Rev. Stat. § 598.092(5)(c) (violation of Nevada Deceptive Trade Practices Act); 15 U.S.C. § 1703(a)(2) (violation of Interstate Land Sales Full Disclosure Act); Nev. Rev. Stat. § 90.570 (violation of Nevada securities laws). Mere puffery is not actionable. Bulbman, 825 P.2d at 592. Generally, the false statement must be about presently existing facts, and consequently estimates, opinions, or promises of future performance typically are not actionable as fraud. Id. However, promises as to future conduct are actionable if the plaintiff can show the defendant made the promise with no intent to perform. Id. Additionally, a projection becomes a "'factual' misstatement if (1) the statement is not actually believed, (2) there is no reasonable basis for

the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." Provenz v. Miller, 102 F.3d 1478, 1487 (9th Cir. 1996) (quotation and emphasis omitted); In re VeriFone Sec. Litig., 11 F.3d 865, 870-71 (9th Cir. 1993). However, a negligent misrepresentation claim cannot be based on a promise of future performance "because such a statement is either fraudulent, i.e., the person never held that intention at the time he made the statement, or it was not a misrepresentation at all, the person simply later failed to perform as promised." Cundiff v. Dollar Loan Ctr. LLC, 726 F. Supp. 2d 1232, 1238 (D. Nev. 2010).

"The suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist." Villalon v. Bowen, 273 P.2d 409, 414 (Nev. 1954). To establish fraudulent concealment, a plaintiff must show: "(1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff . . .; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; (5) and, as a result of the concealment or suppression of the fact, the plaintiff sustained damages." Dow Chem. Co. v. Mahlum, 970 P.2d 98, 110 (Nev. 1998), overruled in part on other grounds by GES, Inc. v. Corbitt, 21 P.3d 11 (Nev. 2001). A duty to disclose arises "where the defendant alone has knowledge of material facts which are not accessible to the plaintiff." Epperson v. Roloff, 719 P.2d 799, 804 (Nev. 1986). Additionally, a "special relationship" between the parties may trigger the duty to disclose. Mackintosh v. Jack Matthews & Co., 855 P.2d 549, 553-54 (Nev. 1993). The duty to disclose may arise "in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence." Id. at 553 (quotation omitted).

///

4

### A. Unit Size and Marcus Hotels' Experience and Expertise

Plaintiffs have failed to raise a genuine issue of material fact that Defendants made any false statements regarding unit size or Marcus Hotels' experience and expertise. As to unit size, the Court has explained in an Order filed this date that pursuant to the contractually specified means of measuring unit size, the units are not undersized. As to Marcus Hotels' experience and expertise, Plaintiffs identify several statements Defendants make in the marketing materials regarding Marcus Hotels, but Plaintiffs present no evidence or argument as to why any of these statements are false. (Pls.' Opp'n to Defs.' Mot. Summ. J. on Fraud Sounding in Fraud (Doc. #211) (unredacted version) at 29-30.) The Court therefore will grant Defendants' Motion on all of Plaintiffs' fraud-based claims with respect to unit size and Marcus Hotels' experience and expertise.

### B. Occupancy Rates

Plaintiffs' fraud-based claims regarding the occupancy rates rest on two statements by Defendants. The first was contained in the marketing materials sent to all Plaintiffs. This document, entitled "Platinum Suite Hotel & Spa Double Occupancy Opportunities," states that double occupancy rates on the Las Vegas Strip were at an aggregate of 87 percent. (Pls.' Opp'n to Defs.' Mot. Summ. J. on Claims Sounding in Fraud (Doc. #206) ["Pls.' Opp'n"], Ex. 1.) The document thus encouraged unit owners to furnish their units with two beds. (Id.)

No genuine issue of material fact remains that this document fails to support a fraud claim. Although Plaintiffs characterize this document as a projection that the Platinum would have a 87 percent occupancy rate, the document does not purport to make any projection of occupancy rates at the Platinum. The document refers only to double occupancy rates, not occupancy rates generally. It sets forth only the rate at which rooms which actually were rented were done so for more than one occupant in the room. Additionally, the identified occupancy rate refers to the then-current rates on the Las Vegas

Strip. Nowhere does the document project future occupancy rates for the Platinum. To the extent Plaintiffs' fraud-based claims regarding occupancy rates rest on this document, the Court will grant summary judgment on all claims in Defendants' favor, as Plaintiffs have not shown the actual statement made was false.

Plaintiffs' fraud-based claims based on occupancy rates also rest on verbal statements regarding occupancy rates made by Defendants' sales representatives. Plaintiffs identify no evidence in the record that Plaintiffs Jose Aranda, Gary Benson, Kathryn Berkowitz, Daniel Cruzen, William Frank, Stephen Goodman, Anthony Greenfield, Aram Hajnabi, Bruce James, Arthur Kraft, Immaculate Medici, Susan Mills, Shashi Daman Paul, Janet Paul, Robert Perlman, James Robert, Mark Schechter, Alan Shams, Cynthia Shams, Lolita Sy, Linda Taglianetti, Rick Tichman, Gian-Paolo Veronese, Greg Waddilove, Robert Walpert, and Craig Wasserman heard any specific representation regarding occupancy rates. (Pls.' Opp'n, Exs. 4, 6-8, 10-14, 17, 19-20, 22-24, 26-36.) Consequently, no genuine issue of fact remains that Defendants did not make a false statement regarding occupancy rates to these Plaintiffs. The Court therefore will grant Defendants' Motion on all the fraud-based claims for these Plaintiffs to the extent those claims rest on an alleged false statement of occupancy rates.

However, Plaintiffs Ion Baroi, Ralph Dulac, Sandi James, Katrina Knafl, Kristi Malzone, Joseph Nahas, Todd Porter, and Paul Wynn aver that Defendants' sales representatives made specific occupancy rate projections of 80 to 90 percent. (Pls.' Opp'n, Exs. 5, 9, 15-16, 18, 21, 25, 37.) These projections were well above Defendants' internal projection of 73 to 77 percent projected occupancy rates for the first eight years of operation. (Pls.' Opp'n, Ex. 40 at 21.) Defendants did not disclose to Plaintiffs that their internal projections were substantially lower than the 80 to 90 percent rates their sales representatives pitched to these particular Plaintiffs. Thus, even though the occupancy rate was a projection, a reasonable fact finder could find Defendants did not believe the 80 to 90

percent occupancy rate, the higher rate was without a reasonable basis, and Defendants were aware of undisclosed facts tending seriously to undermine the statement's accuracy in the form of their own undisclosed projections. In effect, the presently-existing fact which Defendants misrepresented was that their projection of the occupancy rate was 80-90 percent when in fact their projection was much lower.[1] Alternatively, a reasonable fact finder could find Defendants did not intend to perform at an 80 to 90 percent occupancy rate when their own internal projections were much lower. The Court therefore will deny Defendants' Motion on the fraud-based claims to the extent those claims are based on false occupancy rate projections as to Plaintiffs Ion Baroi, Ralph Dulac, Sandi James, Katrina Knafl, Kristi Malzone, Joseph Nahas, Todd Porter, and Paul Wynn.

**C. Rental Rates**

On January 29, 2004, Defendants prepared a room rate matrix which projected room rates for the three types of units as follows:

|  | Season | Low Demand | High Demand |
|---|---|---|---|
| Solitaire: | Low | $85 | $100 |
|  | Medium | $105 | $155 |
|  | High | $160 | $200 |
| Princess: | Low | $105 | $120 |
|  | Medium | $135 | $185 |
|  | High | $200 | $240 |
| Marquis: | Low | $135 | $150 |
|  | Medium | $205 | $255 |
|  | High | $310 | $350 |

(Pls.' Opp'n, Ex. 45.) That same date, Marcus Hotels employee Bruce Hoffman made handwritten notations on the projected room rate matrix by striking out all numbers except

---

[1] For this same reason, these Plaintiffs' negligent misrepresentation claims regarding occupancy rates remain viable even though a negligent misrepresentation claim cannot be based on a promise of future performance. See Cundiff, 726 F. Supp. 2d at 1238.

7

the lowest and highest projected rate for each room type.  (Pls.' Mot. Summ. J. (Doc. #136) ["Pls.' MSJ"], Exs. 21, 23.)  On February 16, 2004, the highest rate for the Solitaire suite was raised from $200 to $225 and the Princess suite similarly was raised from $240 to $295.  (Pls.' Opp'n, Ex. 39 at 70-71.)  The Marquis room rate was proposed to be raised from $350 to $675, but instead was raised to $575.  (Pls.' Opp'n, Ex. 46 at 114-15.)  None of Defendants' employees who were involved in preparing the projections could recall any specific information that supported the increase in the projected rate ranges during that time.  (Pls.' Opp'n, Ex. 39 at 70-71, Ex. 45, Ex. 46 at 111, Ex. 47 at 129-30.)  The final projected room rate range actually provided to prospective buyers of units in the Platinum was as follows:

| Unit Type | Low Demand | High Demand |
| --- | --- | --- |
| Solitaire | $85 | $225 |
| Princess | $105 | $295 |
| Marquis | $135 | $575 |

(Pls.' Opp'n, Ex. 1.)  The projected room rate range contained the following disclaimer:

> The rates listed above are a range of projected room rates only and may not represent the actual rates charged.  No representation or warranty is made that the listed rates can be achieved.  You are not to rely on them for any purpose.

(Id.)  During this period, the Las Vegas tourism industry was in an upward trend.  (Pls.' Opp'n, Ex. 41.)  However, after the Platinum opened, the Las Vegas economy suffered due to the economic downturn beginning in late 2007.  (Defs.' MSJ, Ex. 204.)  Even so, from 2007 through 2010, the Platinum's actual average daily room rate fell within the projected room rate range given to unit owners in the marketing materials.  (Id.)

According to Plaintiffs' experts, Dennis Gemberling ("Gemberling") and Brian Gordon ("Gordon"), the information upon which Defendants relied to make their projections were not sufficient because those sources did not provide information about

room rates at comparable boutique, non-casino condominium hotels. (Pls.' Opp'n, Exs. 57, 58.) Both Gemberling and Gordon criticized Defendants' comparison of the Platinum to larger hotel-casinos such as Caesar's Palace and The Mirage. (Id.) Gordon also criticized the dramatic increase in projected room rates in one week's time in February 2004, particularly where no internal documentation was located to support the increase. (Pls.' Opp'n, Ex. 58.)

Viewing the facts in the light most favorable to Plaintiffs, a reasonable fact finder could find Defendants did not disclose to Plaintiffs that their initial internal room rate projections were lower than the room rate projections given to prospective purchasers. A reasonable fact finder could conclude Defendants' projections rose over a short period of time with no documentary or testimonial evidence supporting the changes. Thus, even though the room rates were projections, a reasonable fact finder could find Defendants did not genuinely believe the room rates provided to potential buyers, the higher rates were without a reasonable basis, and Defendants were aware of undisclosed facts tending seriously to undermine the statement's accuracy in the form of their own undisclosed projections made only two weeks prior. In effect, the presently-existing fact which Defendants misrepresented was that their projection of the room rate range was as represented in the document provided to potential purchasers, when in fact their projections were much lower.[2] Alternatively, a reasonable fact finder could conclude Defendants had no intent to perform at the higher rates when their initial projections were lower and there was no apparent support for the increases. The Court therefore will deny Defendants' Motion as to all fraud-based claims based on room rental rate projections.

///

---

[2] For this same reason, Plaintiffs' negligent misrepresentation claims regarding room rental rates remain viable even though a negligent misrepresentation claim cannot be based on a promise of future performance. See Cundiff, 726 F. Supp. 2d at 1238.

9

### D. Rental Program/Covering the Mortgage

Defendants knew from the beginning of the project that units would not "cash flow," that is, the unit owners would not cover their expenses or make a profit from the rental program. (Pls.' Opp'n, Ex. 46 at 194-95.) For example, a presentation at a September 2003 Capital Asset Committee Meeting, prior to the Platinum condominium units being offered for sale, stated that the Platinum--

> cannot generate enough room rental income for the owners to satisfy any type of return for [proposed selling prices ranging from $480,000 to $590,000]. We comfortably can deliver enough room rental split to support a $300,000 selling price, but would have a hard time delivering enough rental income to support a $500,000 sales price. This really makes the decision as to where to price the units very important and the consideration of whether or not people will indeed be looking for a return off of this investment critical.

(Pls.' Opp'n, Ex. 50.) Defendants' internal projections showed a negative cash flow for all unit types if prices were over $285,000 for the small units and over $375,000 for the large units. (Pls.' Opp'n, Ex. 60.) Plaintiffs paid from $374,000 to $899,000 for their units, with most Plaintiffs paying between $429,000 and $624,000. (Defs.' Opp'n to Mot. Summ. J. (Doc. #151), Addendum A.) Defendants did not disclose to unit owners their knowledge or internal projections that at these prices, the rental program would not cover unit owners' mortgages and other expenses related with owning the units, much less turn a profit. (Pls.' Opp'n, Ex. 46 at 195.)

Defendants knew that the rental program was an important aspect of marketing the Platinum to prospective buyers. (Id. at 156.) Defendants also knew that prospective buyers were inquiring about potential revenue streams from the rental program, and that prospective buyers were purchasing the units for the sole purpose of receiving a return on renting the unit. (Pls.' Opp'n, Ex. 46 at 194-95, Ex. 53.)

Defendants further were aware that their sales representatives were making representations to prospective buyers that unit owners would be able to cover their costs of

10

ownership and eventually turn a profit through the rental program.  For example, in a February 2004 email from Marcus Hotels employee Keith Halfmann ("Halfmann") to Marcus Hotels president William Otto ("Otto"), Halfmann indicated that while setting up a model room at the Platinum a few days prior, he overheard a sales representative on a tour with a prospective buyer.  (Pls.' MSJ, Ex. 26, Ex. 30 at 97.)  The prospective buyer asked what type of rental income could be expected, and, according to Halfmann, the sales representative stated: "The First year you will be writing checks to cover the mortgage[.] The Second year you will be writing less checks[.]  The Third year you will start to see a payback."[3]  (Id.)

Peter Rockwood ("Rockwood"), Vice President and General Manager of the Platinum, testified at his deposition that all three salespersons were promoting the opportunity to place the units in the rental program as a leading selling point for the units. (Pls.' MSJ, Ex. 4, Ex. 5 at 190-91.)   In an April 2006 email chain, Rockwood expressed his belief that the sales representatives "promote the . . . 'opportunity to place their unit in a rental program' as a lead selling proposition to move the units."  (Pls.' MSJ, Ex. 17.) According to Rockwood,

> the buyers [he has] seen or heard come thru the sales office are pretty much solely interested in the units generating income and covering their nut.  Somehow we need to cut this off at the pass and have [the sales representatives] focus more on the selling of the unit as a 'lifestyle' and a second/third home as opposed to this great program that will be a revenue generator for them.

(Id.)  Tom Diehl ("Diehl"), a partner in Platinum Development at that time, stated he was--

> totally aware that a great many owners have purchased units for the sole purpose of receiving a return on them, either from the rental pool, resale or a combination of both.  We have all known since the

---

[3] At his deposition, the sales representative denied discussing rental income with prospective buyers. (Defs.' Opp'n, Ex. 40 at 111.)  However, the Court must view the evidence in the light most favorable to Plaintiffs, the non-moving parties.

11

>     beginning of this project that the units would not cash flow from
>     strictly a rental stand point. We all hope that the hotel operation will
>     exceed our projections; however we can not discuss any of that
>     material with the buyers.

(Id.) Plaintiffs aver that the sales representatives told them the rental program would cover Plaintiffs' ownership costs and/or turn a profit for Plaintiffs. (Pls.' Opp'n, Exs. 4-37.)

Viewing this evidence in the light most favorable to Plaintiffs, a reasonable fact finder could find that Defendants did not disclose to Plaintiffs that their internal rental program projections indicated unit owners would not cash flow at the prices at which Defendants sold the units. A reasonable fact finder also could find Defendants' sales representatives sold the units by telling Plaintiffs that unit owners would cover their expenses or make a profit by participating in the rental program. Thus, even though representations regarding a return on the rental program were projections, a reasonable fact finder could conclude Defendants did not genuinely believe the rental program would cover unit owners' expenses or make a profit, the representations regarding the rental program were without a reasonable basis, and Defendants were aware of undisclosed facts tending seriously to undermine the representations' accuracy in the form of their own undisclosed projections regarding negative cash flow. In effect, the presently-existing fact which Defendants misrepresented was that their representations regarding the rental program reflected Defendants' true assessment of unit owners' cash flow prospects from the rental program, when in fact their internal projections showed the opposite.[4] Alternatively, a reasonable fact finder could conclude Defendants did not intend to perform the rental program at levels sufficient to match the promised returns. The Court therefore will deny Defendants' Motion as to all fraud-based claims based on the rental program.

---

[4] For this same reason, Plaintiffs' negligent misrepresentation claims regarding the rental program remain viable even though a negligent misrepresentation claim cannot be based on a promise of future performance. See Cundiff, 726 F. Supp. 2d at 1238.

12

### E. Position in the Market

The Platinum's marketing materials made the following representations about the Platinum's positioning in the market:

> The Platinum Suite Hotel and Spa will be positioned as the newest "alternative" hotel entry in the Las Vegas market. We will market the property's unique facilities, prime location situated between the Strip and the numerous upscale dining options just to the east, and the enhanced services and amenities of this intimate luxury suite hotel to secure worldwide recognition as one of the most desirable boutique hotels in Las Vegas. The Platinum Suite Hotel and Spa will be recognized for its residential ambience, sensual design, personalized services, and excellent value, all of which will be supported through targeted and sophisticated sales & marketing programs. . . .
>
> The Platinum Suite Hotel and Spa will be positioned slightly below the more widely recognized hotels such as the Four Seasons, Mandalay Bay, the Bellagio, and Mirage, and slightly above the traditional names such as Caesar's, Bally's, the Tropicana, and MGM, by providing comfortable and fashionable design, friendly yet professional services, creative food and beverage concepts, and affordable elegance which embellishes the boutique concept. Our direct competitors are expected to be the Hard Rock Hotel and Casino, The Palms, The Alexis, THEhotel at Mandalay Bay, and the Rio. We will also target the current suite guests of the Venetian, New York New York, Paris and other users of high-end suite products at casino hotels.
>
> . . .
>
> Emphasis will be placed on maintaining a balanced occupancy and average rate through a strategic plan that positions this boutique hotel as a unique alternative to "conventional" casino products. . . .
>
> The hotel will be very high style and high touch, but will not be perceived as pretentious or ostentatious, as is found at the majority of the large casinos and hotels. It will have the service level of a luxury hotel yet a very residential look and feel, and will take the traditional boutique concept to a new level not seen in the Las Vegas market to date.

(Pls.' Opp'n, Ex. 1.)

Plaintiffs contend Defendants had no reasonable basis to compare the Platinum to hotels such as the Four Seasons, Mandalay Bay, or Bellagio. However, Plaintiffs fail to point to any evidence raising a genuine issue of material fact that Defendants' projections or opinions about the Platinum's future intended market position were false. Unlike the room or occupancy rate projections, Plaintiffs point to no internal documents or other evidence

13

1 that Defendants did not believe their statements regarding the Platinum's projected market
2 position, or that Defendants had no intent to perform any promise regarding the Platinum's
3 market position.  To the extent Plaintiffs contend Defendants erroneously equated the
4 Platinum to the larger hotel-casinos in terms of size or number of restaurants, the
5 Platinum's marketing materials made no such representations.  Rather, the marketing
6 materials identified the Platinum as a smaller, non-casino alternative to the larger hotel-
7 casinos.  The Court therefore will grant Defendants' Motion with respect to all fraud-based
8 claims based on the Platinum's market position.

### F. Fraudulent Concealment

10 Nevada generally does not recognize an action for fraud based on nondisclosure.
11 See Epperson, 719 P.2d at 803-04 (noting the "general rule" that "an action in deceit will
12 not lie for nondisclosure").  However, a duty to disclose may arise from the parties'
13 relationship. Dow Chem. Co., 970 P.2d at 110 ("The duty to disclose requires, at a
14 minimum, some form of relationship between the parties.").  For example, where the parties
15 are involved in a transaction and the defendant knows material facts which are not
16 accessible to the plaintiff, the defendant has a duty of disclosure. Id.; see also Nelson v.
17 Heer, 163 P.3d 420, 426 (Nev. 2007) ("The suppression or omission of a material fact
18 which a party is bound in good faith to disclose is equivalent to a false representation, since
19 it constitutes an indirect representation that such fact does not exist." (quotations omitted)).
20 Additionally, a "special relationship" between the parties may trigger the duty to disclose,
21 even where the plaintiff has access to facts suggesting a problem exists. Mackintosh, 855
22 P.2d at 553. The duty to disclose may arise "in any situation where one party imposes
23 confidence in the other because of that person's position, and the other party knows of this
24 confidence." Id. (quotation omitted).

25 Plaintiffs fail to present evidence or supporting case law that parties to an arms'
26 length real estate transaction are in a special relationship imposing fiduciary-like duties on

14

one of the parties.  However, a reasonable fact finder could find that Defendants knew material facts in the form of their internal projections which were not accessible to Plaintiffs, such that Defendants had a duty of disclosure.  The Court expresses no opinion on whether Defendants would have been required to disclose internal projections to Plaintiffs as a general matter.  However, once Defendants disclosed projections to Plaintiffs, a reasonable fact finder could find Defendants thereby made the implicit representation that those projections accurately reflected Defendants' projections on occupancy rates, rental room rates, and the expected return on the rental program and that no contrary projections existed.  The Court therefore will deny Defendants' Motion on fraudulent concealment with respect to the rental program and the room rental rates as to all Plaintiffs, and with respect to the occupancy rates as to Plaintiffs Ion Baroi, Ralph Dulac, Sandi James, Katrina Knafl, Kristi Malzone, Joseph Nahas, Todd Porter, and Paul Wynn.

### G.  Due Diligence

Plaintiffs contend Defendants did not conduct adequate due diligence to support the representations made in the marketing materials.  Plaintiffs contend Defendants should be collaterally estopped from disputing they did not adequately evaluate the market for the Platinum based on a state court's factual finding in separate litigation.  Defendants respond the issue litigated in the state court action was not the same one as presented in this case, and Defendants therefore should not be estopped.

Collateral estoppel does not apply because the issues litigated in the state court action and this action are not identical.  See State, Univ. & Cmty. Coll. Sys. v. Sutton, 103 P.3d 8, 16 (Nev. 2004) (stating that under Nevada law, for collateral estoppel to apply, "the issue decided in the prior litigation must be identical to the issue presented in the current action.").  In the state court action, Marnell Architecture, P.C. v. Platinum Condominium Development, LLC, the state court found "[t]here was never a full appreciation by Platinum of the uniqueness of the Las Vegas High Rise Condo/Hotel Market during the time this

15

1  project was conceived and built." (Pls.' Opp'n, Ex. 55 at 20.)   However, the state court

2  action involved a construction contract dispute, and the state court's finding was related to

3  the market for labor, materials, and related financing issues.  (Id.)  Nothing in the state

4  court's order suggests the parties litigated or the state court decided anything related to

5  occupancy rates, room rental rates, the rental program, or the Platinum's market position.

6  Collateral estoppel therefore does not apply.

## III. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion for Partial Summary Judgment Against Claims Sounding in Fraud (Doc. #164) is hereby GRANTED in part and DENIED in part.  The Motion is granted as to Plaintiffs' fraud-based claims as to all Plaintiffs with respect to representations regarding (1) unit size, (2) Marcus Hotels' experience and expertise, and (3) the Platinum's market position.  The Motion also is granted as to the fraud-based claims of Plaintiffs Jose Aranda, Gary Benson, Kathryn Berkowitz, Daniel Cruzen, William Frank, Stephen Goodman, Anthony Greenfield, Aram Hajnabi, Bruce James, Arthur Kraft, Immaculate Medici, Susan Mills, Shashi Daman Paul, Janet Paul, Robert Perlman, James Robert, Jr., Mark Schechter, Alan Shams, Cynthia Shams, Lolita Sy, Linda Taglianetti, Rick Tichman, Gian-Paolo Veronese, Greg Waddilove, Robert Walpert, Craig Wasserman to the extent their claims are based on false representations of occupancy rates.  The Motion is denied in all other respects.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Leave to File Excess Pages (Doc. #205) is hereby GRANTED.

DATED:  July 10, 2012

_____
PHILIP M. PRO
United States District Judge