UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ION BAROI, et al., | ) |
| | ) |
| Plaintiffs, | )        2:09-CV-00671-PMP-GWF |
| | ) |
| v. | ) |
| | ) |
| PLATINUM CONDOMINIUM | )        ORDER |
| DEVELOPMENT, LLC; MARCUS | ) |
| HOTELS, INC.; and MARCUS | ) |
| MANAGEMENT LAS VEGAS, LLC, | ) |
| | ) |
| Defendants. | ) |

Presently before the Court is Defendants' Motion for Partial Summary Judgment on Count 12 (Doc. #166), filed on December 23, 2011.  Plaintiffs filed an Opposition (Doc. #196/#201) on February 8, 2012.  Defendants filed a Reply (Doc. #217) on February 29, 2012.

This case arises out of Plaintiffs' purchases of condominium units in Defendant Platinum Condominium Development, LLC's ("Platinum Development") condo/hotel project, the Platinum, located in Las Vegas, Nevada.  The Platinum hotel was run by Defendant Marcus Management Las Vegas, LLC.  Plaintiffs brought suit in Nevada state court in March 2009, and Platinum Development removed the action to this Court.  (Pet. for Removal (Doc. #1).)

The Court set forth the factual background in this matter in a separate order filed this date.  The Court will not repeat the facts here except where necessary to resolve the present motions.

///

Among Plaintiffs' various claims is the allegation that Defendant Marcus Hotels, Inc. ("Marcus Hotels") is liable under theories of joint venture, agency, and ratification (count 12).  (Third Am. Compl. (Doc. #89).)  Defendants move for summary judgment on count 12, arguing Plaintiffs' theories of joint venture, agency, and ratification are an attempted end run around Nevada's limited liability company ("LLC") and alter ego law, and cannot support holding a parent company liable for its subsidiary's acts.  Defendants alternatively argue that Plaintiffs' agency theory fails factually.

Plaintiffs respond that Defendants' conduct fits within the definition of a joint venture under Nevada law, and Defendants themselves referred to the project as a joint venture.  Plaintiffs also argue a subsidiary may have actual or apparent authority to act as an agent for its parent, and whether Platinum Development was Marcus Hotels' agent is a question of fact.  Finally, Plaintiffs contend Marcus Hotels ratified Platinum Development's conduct.

## I.  LEGAL STANDARD

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

## II. DISCUSSION

### A. Joint Venture

Defendants contend a joint venture among the members of Platinum Development cannot exist because Platinum Development is organized as an LLC, and Nevada statutory law provides that members are not liable for the LLC's debts.  Defendants also argue that to the extent Plaintiffs contend Marcus Hotels was in a joint venture with Platinum Development, there is no evidence Marcus Hotels and Platinum Development share profits.  Rather, Defendants contend the relationship between Marcus Hotels and Platinum Development is governed by a consulting contract, not a joint venture.  In their Motion, Defendants do not move for judgment on the basis that no reasonable jury could find a joint venture between Marcus Hotels and Diversified as a factual matter.

Plaintiffs respond that Marcus Hotels entered into a self-described joint venture to build and subsequently manage the Platinum as a hotel.  Plaintiffs also contend Marcus Hotels is not actually a member of Platinum Development, rather Marcus Hotels' subsidiary, Marcus Development, LLC ("Marcus Development") was a member.  Plaintiffs argue Marcus Hotels took actions in support of the joint venture, including providing loan guarantees, when it was not a member of the LLC.  Alternatively, Plaintiffs argue Marcus Hotels is a joint venturer by estoppel because it referred to the Platinum project as a joint venture.

Under Nevada law, a joint venture is "'a contractual relationship in the nature of an informal partnership wherein two or more persons conduct some business enterprise, agreeing to share jointly, or in proportion to capital contributed, in profits and losses.'" Radaker v. Scott, 855 P.2d 1037, 1040 (Nev. 1993) (quoting Bruttomesso v. Las Vegas Metro. Police Dep't, 591 P.2d 254, 256 (Nev. 1979)).  "A joint venture is a less formal relationship than a partnership and is typically an association entered into to perform a more limited business objective for a more brief period of time."  Hook v. Giuricich, 823 P.2d

294, 296 (Nev. 1992).  To determine whether the parties intended to create a joint venture, the Court applies ordinary rules of contract interpretation and considers the parties' actions and conduct.  Radaker, 855 P.2d at 1040.

The Court may look to principles of partnership law, including the Nevada Uniform Partnership Act, Chapter 87 of the Nevada Revised Statutes, for guidance regarding joint venture law.  Id.  The Uniform Partnership Act provides that a person may become liable as if he were a partner through estoppel principles:

> When a person, by words spoken or written or by conduct, represents himself or herself, or consents to another representing him or her to any one, as a partner in an existing partnership or with one or more persons not actual partners, the person is liable to any such person to whom such representation has been made who has, on the faith of such representation, given credit to the actual or apparent partnership, and if the person has made such representation or consented to its being made in a public manner the person is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made.

Nev. Rev. Stat. § 87.160(1).

However, the Uniform Partnership Act further provides that "[a]ny association formed under any other statute of this State . . . is not a partnership under NRS 87.010 to 87.430."  Nev. Rev. Stat. § 87.060(2).  Instead, an entity formed pursuant to other statutory authority is governed by the body of law pursuant to which the entity was formed.  See Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 909 F.2d 698, 702 (2d Cir. 1990) (stating a "joint venture and a corporation are mutually exclusive ways of doing business," and even though "business associates may be treated as partners vis-a-vis one another even when they operate through a corporation, the corporate form is to be respected in dealings with third parties"); Trans-Tec Asia v. M/V HARMONY CONTAINER, 435 F. Supp. 2d 1015, 1032 (C.D. Cal. 2005) (stating a corporation and a joint venture are "mutually exclusive ways of doing business" (quoting Itel, 909 F.2d at 702)).  This is so because the "unequivocal existence of a definite business form is the most reliable expression of the

relationship among the parties." Ritter v. BJC Barnes Jewish Christian Health Sys., 987 S.W.2d 377, 387 (Mo. Ct. App. 1999) (quotation omitted).

Members of an LLC formed under Nevada law are not individually liable for the LLC's debts or liabilities unless the members agree to assume such liability pursuant to the articles of incorporation or a signed agreement.  Nev. Rev. Stat. § 86.371; see also id. § 86.381 (stating that a member of an LLC is "not a proper party to proceedings by or against the company, except where the object is to enforce the member's right against or liability to the company").  However, members of an LLC can be individually liable as joint venturers for torts committed prior to the formation of the LLC.  See Colonial Refrigerated Transp., Inc. v. Mitchell, 403 F.2d 541, 547 (5th Cir. 1968) (stating that joint venturers' decision to "employ a corporation as a medium for their investment" did "not negate the existence of the joint venture at the moment the alleged tort was committed," where misrepresentations were made prior to use of corporate shell); Muccilli v. Huff's Boys' Store, Inc., 473 P.2d 786, 791 (Ariz. Ct. App. 1970) ("But whether or not a joint venture agreement would or would not survive an actual incorporation (which was not shown), we think it clear that a mere intention on the part of interested parties to carry out some or all aspects of the enterprise through the medium of a corporation is not inconsistent with the present existence of a joint venture.").

Here, Platinum Development is an LLC formed by developer Michael Peterson ("Peterson") under Nevada law on October 28, 2003.  (Decl. of Brian P. Keenan, (Doc. #170) ["Keenan Decl."], Ex. 209; Decl. of Steven S. Bartelt (Doc. #152) ["Bartelt Decl."] at 2.)  Initially, Peterson's company, Diversified Real Estate Concepts, Inc. ("Diversified"), was the sole member of Platinum Development.  (Bartelt Decl. at 2.)  In the fall of 2003 and into early 2004, Marcus Hotels considered what it internally referred to as a "joint venture" with Diversified to build and manage the Platinum.  (Pls.' Opp'n to Defs.' Mot. Summ. J. (Doc. #196/#201) ["Pls.' Opp'n"], Exs. 20, 21, 75.)

1    In January 2004, Diversified and Marcus Hotels entered into a Non-Binding

2  Term Sheet, pursuant to which they agreed to organize a "single-purpose limited liability

3  company which will act as the development entity" for the Platinum.  (Pls.' Opp'n, Ex. 6.)

4  Pursuant to the Term Sheet, the parties agreed they would contribute equally to the pre-

5  development budget, split losses and proceeds from any sale of the project should it be

6  aborted in the pre-development stage, provide certain loan guarantees, and set forth

7  development profit splits.  (Id.)  Marcus Hotels and Diversified also agreed that if they were

8  unable to obtain a development loan on satisfactory terms, "the Project will be aborted and

9  the Development Company dissolved after the sale or other disposition of its assets."  (Id.)

10  On January 27, 2004, Marcus Hotels stated in a press release that Platinum Development

11  was "a joint venture" between Marcus Hotels and Diversified.  (Pls.' Opp'n, Ex. 17.)

12    Eventually, although no evidence is presented as to when, Platinum Development

13  was owned 40 percent by Diversified, 10 percent by TMD Management, Inc. ("TMD"); and

14  50 percent by Marcus Development.  (Bartelt Decl. at 2.)  Marcus Development is a

15  Wisconsin LLC formed in October 2002.  (Id.)  Marcus Hotels is the sole member of

16  Marcus Development.  (Keenan Decl., Ex. 182 at 20; Bartelt Decl. at 2.)  The members

17  executed an Operating Agreement, effective as of December 28, 2004, to govern the

18  operation of Platinum Development.  (Pls.' Opp'n to Defs.' Mot. Summ. J. (Doc.

19  #196/#201), Ex. 10.)  Net profits from sales of units at the Platinum were distributed to the

20  members of Platinum Development on the basis of their ownership share.  (Keenan Decl.,

21  Ex. 182 at 109.)  Any revenue obtained by Marcus Development flowed upstream to

22  Marcus Hotels.  (Id. at 110.)  Marcus Development became the sole member of Platinum

23  Development after it bought out Diversified's interest in October 2006 and TMD's interest

24  in 2007.  (Id. at 20; Bartelt Decl. at 3.)

25    Viewing the facts and all reasonable inferences therefrom in the light most

26  favorable to Plaintiffs, a reasonable jury could conclude Marcus Hotels was in a joint

venture with Diversified at the time Platinum Development sales representatives made the alleged misrepresentations to Plaintiffs in March 2004.  Even accepting Defendants' argument that once joint venturers opt for a definite business form to control their relationship a joint venture ceases to exist, Defendants have failed to point to evidence establishing when Marcus Hotels or its subsidiary, Marcus Development, became a member of Platinum Development.  The January 2004 Non-Binding Term Sheet expressed only an intent to organize an LLC.  The January 2004 press release described Platinum Development as a "joint venture," but it is unclear from any evidence in the record whether Marcus Hotels or Marcus Development actually were members of Platinum Development by the time the January 2004 press release was issued.  The Operating Agreement identifies Marcus Development as a member, but states it was effective as of December 28, 2004.

In their Motion, Defendants state that "[f]rom that time," Marcus Development, Diversified, and TMD were members of Platinum Development, but Defendants do not identify from what time that occurred. (Defs.' Mot. Summ. J. (Doc. #166) at 3.)  The exhibit Defendants cite in support likewise does not state when Marcus Development became a member of Platinum Development.  (Id. (citing Bartelt Decl. at ¶ 9 which states only that "[e]ventually" Marcus Development owned 50 percent of Platinum Development).)  Consequently, Defendants have failed to meet their initial burden of showing no genuine issue of fact remains that Marcus Hotels' relationship with Diversified was defined by membership in Platinum Development via Marcus Development at the time of the alleged misrepresentations.  See Colonial Refrigerated Transp., Inc., 403 F.2d at 547; Muccilli, 473 P.2d at 791.

Moreover, Defendants have failed to establish they are entitled to judgment as a matter of law based on Nevada's LLC statutory provisions in light of Central Bank, N.A. v. Baldwin, 583 P.2d 1087 (Nev. 1978).  In that case, a bank approached a building contractor to "joint venture" construction projects.  Central Bank, 583 P.2d at 1088.  It was illegal for

the bank to loan money to an entity in which it held a stock equity interest.  Id.  The bank "therefore arranged to have its wholly owned subsidiary . . . form with [the contractor] a new construction corporation, Greater Sierra Construction Company" ("Greater Sierra"). Id.  Greater Sierra's stock was divided equally between the contractor and the bank's subsidiary.  Id.  The "principal motivation for forming Greater Sierra was to enable [the bank] to share profits of the venture in addition to the customary bank earnings pursuant to outstanding loans."  Id.

Greater Sierra contracted with the plaintiffs to construct two apartment complexes.  Id.  The plaintiffs sued for construction defects in the apartment complexes, naming Greater Sierra, the contractor, and the bank as joint venturers.  Id. at 1089.  The trial court "made findings of fact that [the bank] was engaged in a joint venture for profit because its subsidiary . . . owned half the stock of Greater Sierra and because it approached [the contractor] with an offer to joint venture some construction projects."  Id.  The plaintiffs thus obtained judgment against all defendants jointly and severally.  Id.

The bank appealed, arguing it was not a joint venturer.  Id.  The Nevada Supreme Court held that substantial evidence supported the trial court's findings that "a joint venture was formed between Central Bank and Harris to form Greater Sierra and engage in substantial construction projects."  Id.  In making this ruling, the Nevada Supreme Court declined to consider the bank's "references to the alter ego doctrine" because the bank raised the issue for the first time on appeal.  Id. at 1090.

Central Bank bears a striking resemblance to the facts in this case: a parent was held liable as a joint venturer in construction projects even though it implemented the joint venture through a corporation owned in part by its subsidiary.  Here, Plaintiffs seek to hold Marcus Hotels liable as a joint venturer in the Platinum even though it holds an interest in Platinum Development, an LLC, through its wholly owned subsidiary, Marcus Development.  In Central Bank, the Nevada Supreme Court did not explicitly address

Defendants' argument in this case, and its cryptic comment regarding the bank's "references to the alter ego doctrine" perhaps suggests the bank belatedly made an argument similar to Defendants' position here.  Nevertheless, the Court cannot conclude Defendants have met their burden of establishing they are entitled to judgment as a matter of law where they have failed to address <u>Central Bank</u>'s significance to the question of whether Marcus Hotels, which is not itself a member of Platinum Development, may be liable as a joint venturer.  The Court therefore will deny Defendants' Motion as to joint venture.

**B.  Agency**

Defendants argue a subsidiary is not the agent of its parent corporation as a matter of Nevada law.  Alternatively, Defendants argue that no genuine issue of fact exists that Platinum Development was not Marcus Hotels' agent because Marcus Hotels had no legal right to control Platinum Development where it was only a 50 percent owner.  Plaintiffs respond that a subsidiary can be its parent's agent without having to resort to alter ego principles, and whether an agency relationship exists is a question of fact.  Plaintiffs further contend that even if Platinum Development or its sales representatives had no actual authority to represent Marcus Hotels, they had apparent authority to do so.  Defendants reply that Plaintiffs cannot show apparent authority because they point to no evidence that Marcus Hotels held out the sales agents as its representatives or that Plaintiffs relied on any such conduct in making their condominium purchases at the Platinum.

"To bind a principal, an agent must have actual authority, express or implied, or apparent authority."  <u>Dixon v. Thatcher</u>, 742 P.2d 1029, 1031 (Nev. 1987).  Actual authority exists "when one who hires another retains a contractual right to control the other's manner of performance."  <u>Grand Hotel Gift Shop v. Granite State Ins. Co.</u>, 839 P.2d 599, 602 (Nev. 1992).  "Apparent authority is that authority which a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing, under such circumstances as to estop the principal from denying its existence."  <u>Dixon</u>, 742 P.2d at

9

1031 (quotation omitted).

A party claiming an agent had apparent authority must show: "(1) that he subjectively believed that the agent had authority to act for the principal and (2) that his subjective belief in the agent's authority was objectively reasonable." Great Am. Ins. Co. v. Gen. Builders, Inc., 934 P.2d 257, 261 (Nev. 1997). To make this showing, the plaintiff must demonstrate he relied on "what the principal himself has said or done, or at least said or done through some other . . . authorized agent." Ellis v. Nelson, 233 P.2d 1072, 1076 (Nev. 1951). The plaintiff cannot rely only on the agent's acts or statements to establish apparent authority, unless the plaintiff also presents evidence the principal knew and acquiesced in those acts or statements. Id.

The principal may cloak a person with apparent authority based on representations made directly to the plaintiff, as well as indirectly, such as "by advertising, by authorizing the agent to state that he is authorized, or by continuously employing the agent." Restatement (Second) Agency § 8 cmt. b. For example,

> [i]f a principal puts an agent into, or knowingly permits him to occupy, a position in which according to the ordinary habits of persons in the locality, trade or profession, it is usual for such an agent to have a particular kind of authority, anyone dealing with him is justified in inferring that he has such authority, in the absence of reason to know otherwise.

Id. § 49 cmt. c. However, "the party who claims reliance must not have closed his eyes to warnings or inconsistent circumstances." Tsouras v. Sw. Plumbing & Heating, 587 P.2d 1321, 1323 (Nev. 1978) (quotation omitted).

The party asserting an agency relationship exists bears the burden of proving agency. Trump v. Eighth Judicial Dist. Court of State of Nev. In & For Cnty. of Clark, 857 P.2d 740, 745 n.3 (Nev. 1993). Generally, whether an agency relationship exists is a question of fact. Great Am. Ins. Co., 934 P.2d at 261; N. Nev. Mobile Home Brokers v. Penrod, 610 P.2d 724, 726 (Nev. 1980).

### 1.  Parent/Subsidiary Relationship

To the extent Defendants contend a subsidiary cannot be its parent's agent as a matter of Nevada law, the Court rejects that argument.  Defendants cite no authority for this proposition.  While a subsidiary is not its parent's agent merely by virtue of the parent/subsidiary relationship, an agency relationship may exist between a parent and its subsidiary.  Restatement (Second) of Agency § 14M & cmt. a.

### 2.  Actual Authority

No genuine issue of material fact remains that Platinum Development did not have actual authority to act as Marcus Hotels' agent.  Marcus Hotels did not have the legal right to control Platinum Development's performance.  During the relevant time period, Marcus Hotels was a 50 percent owner of Platinum Development through its wholly owned subsidiary, Marcus Development.  It therefore did not have the legal right to control Platinum Development's manner of performance without participation of at least one of the other members of Platinum Development.  Under the Platinum Development Operating Agreement, decisions required the vote of more than 50 percent of the members, and some decisions required unanimous consent.  (Pls.' Opp'n, Ex. 10 at 15-17.)  The Operating Agreement further provided that Peterson of Diversified would be Platinum Development's President, and Peterson had the authority to direct and manage Platinum Development's business.  (Id.; see also id. at 14 (providing that unless otherwise specifically set forth in the Operating Agreement, "[n]o Member shall have any right or authority to participate in the management of the Company's Business").

For these same reasons, Marcus Hotels had no legal right to control Platinum Development's sales agents, who contracted with Platinum Development, not Marcus Hotels.  (Keenan Decl., Exs. 205-07.)  Consequently, although agency generally is a fact question, here no genuine issue of material fact remains as to Marcus Hotels' legal right to control Platinum Development or its sales agents, and therefore no agency relationship

based on actual authority existed as a matter of law.

### 3. Apparent Authority

Viewing the facts and all reasonable inferences therefrom in the light most favorable to Plaintiffs, a reasonable jury could find Plaintiffs believed they were dealing with an authorized representative of Marcus Hotels. For example, Plaintiff Alan Shams equated the Platinum with Marcus Hotels, and testified that he "talked to [a] representative of Marcus Hotel [sic] at the Platinum." (Pls.' Opp'n, Ex. 51 at 27-28; see also Ex. 60 (Plaintiff Ralph Dulac likewise equating Marcus Hotels and Platinum, stating "Marcus Resorts Corporation or Platinum--and there were several names they went by . . . .").) Plaintiff Aram Hajnabi testified he thought he was calling the "Marcus sales office" when he called Platinum Development's number, and that he "thought [he] was buying into Marcus. . . . Not Platinum. I thought I was buying into Marcus, Marcus Management." (Pls.' Opp'n, Ex. at 59 19, 27; see also Ex. 67 (Plaintiff Robert Perlman testifying about representations made by someone at the sales office: "This is a person of the Marcus organization talking about the capabilities of the Marcus organization . . . ."); Pls.' Opp'n to Defs.' Mot. Partial Summ. J. (Doc. #206), Exs. 4-37 (referring to Platinum and Marcus interchangeably or as a single unit).) Additionally, Plaintiffs have averred that the sales representatives touted Marcus Hotels' participation in the project as a selling point in marketing the condominium unit in combination with the rental program to be operated by Marcus Hotels, and Plaintiffs relied on these representations. (See, e.g., Pls.' Opp'n, Ex. 59 at 25; Pls.' Opp'n to Defs.' Mot. Partial Summ. J. (Doc. #206), Exs. 4-37.)

Additionally, viewing the facts and all reasonable inferences therefrom in the light most favorable to Plaintiffs, a reasonable jury could find Plaintiffs' subjective beliefs were reasonable. Sales representatives provided prospective buyers with materials printed on Marcus Hotels' letterhead, which Marcus Hotels provided to the sales representatives for use as marketing materials. (Pls.' Opp'n, Exs. 3, 17.) For example, the "Platinum Suite

Hotel & Spa Double Occupancy Opportunities" was provided to prospective buyers on Marcus Hotels' letterhead.  (Pls.' Opp'n, Ex. 17.)  That document directed prospective buyers to "advise your sales representative should you wish to pursue this opportunity." (Id.)  The projected room rates, a description of the Platinum's proposed market position, and a list of fee services also were presented on Marcus Hotels' letterhead.  (Id.)

        Additionally, sales representatives gave prospective buyers a press release issued by Marcus Hotels in which Platinum Development is described as a "joint venture between Marcus Hotels and Resorts, a leading third-party, independent hotel management company," and Diversified.  (Pls.' Opp'n, Ex. 5, Ex. 7 at 113, Ex. 17.)  According to the press release, Marcus Hotels and Diversified were going to "oversee construction management, with Marcus Hotels and Resorts operating the hotel and public space upon opening."  (Pls.' Opp'n, Ex. 17.)  The press release quoted Bill Otto, identified in the press release as Marcus Hotels' president, discussing the Platinum using terms such as "we" and "our."  (Id. ("We . . . look forward to creating an atmosphere and product that set our property apart from the typical Las Vegas experience"; "This project further diversifies our management portfolio geographically . . . .").)  The press release touted Marcus Hotels' experience in the hotel industry.  (Id.)  It also provided information regarding the sales center and listed a phone number for sales representatives.  (Id.)

        Viewing the evidence and reasonable inferences therefrom in the light most favorable to Plaintiffs, a reasonable jury could conclude these facts led Plaintiffs subjectively and objectively to believe Platinum Development and/or its sales representatives had apparent authority to act as Marcus Hotels' agent.  Marcus Hotels announced its participation in the construction of the project as well as the post-opening operation of the hotel and referred to the Platinum as Marcus Hotels' project.  It provided sales representative contact information in the press release announcing Marcus Hotels' participation in the project.  Marcus Hotels directed prospective buyers to the sales

representatives on a document containing Marcus Hotels' letterhead and provided sales

materials on Marcus Hotels' letterhead to the sales representatives to use as a selling point

by touting Marcus Hotels' involvement.  The Court therefore will deny Defendants' Motion

for Partial Summary Judgment on count 12 with respect to agency based on apparent

authority.

### C.   Ratification

Defendants argue that as a matter of Nevada law, ratification does not exist in the

context of a parent and subsidiary.  Additionally, Defendants argue that ratification applies

only to a principal's ratification of its agent's conduct, and because neither Platinum

Development nor its sales representatives are Marcus Hotels' agents, Plaintiffs cannot rely

on a ratification theory to hold Marcus Hotels liable.  Finally, Defendants argue that even if

ratification could apply in this case, fraud cannot be ratified.  Plaintiffs respond that

Platinum Development and its sales representatives were Marcus Hotels' agents, and

therefore Marcus Hotels could ratify their conduct.  Plaintiffs also argue a principal can

ratify its agent's fraudulent conduct.

Under Nevada law, a principal may ratify an agent's act if it was purportedly

done on the principal's behalf.  See, e.g., Harrah v. Specialty Shops, 221 P.2d 398, 399

(Nev. 1950); Edwards v. Carson Water Co., 34 P. 381, 389 (Nev. 1893).  The principal

ratifying the agent's actions may be an individual or a corporation.  See Edwards, 34 P. at

389.

Defendants cite no authority for the proposition that as a matter of law, Nevada

would not allow a parent corporation to ratify its subsidiary's actions if the subsidiary was

acting as the parent's agent.  As discussed above, a subsidiary may act as its parent's agent,

and agency principles will govern the relationship.  Ratification, as a principle of agency

law, therefore may apply where an agency relationship exists between a parent and its

subsidiary.

1       Additionally, the Court rejects Defendants' argument that a principal cannot

2    ratify its agent's fraudulent or illegal acts.  The authority upon which Defendants rely is not

3    controlling, Defendants cite no Nevada law on point, and Defendants' cases are

4    distinguishable.  Two of the cases upon which Defendants rely arise in the context of an

5    insurer or surety attempting to avoid coverage where it contracted to insure against a

6    corporation's employees engaging in fraud by arguing the acts were not fraudulent because

7    the corporation ratified its wayward employee's conduct.  See Gen. Fin. Corp. v. Fid. &

8    Cas. Co. of N.Y., 439 F.2d 981, 983, 986 (8th Cir. 1971) (holding a corporation could not

9    ratify its president's fraudulent acts, and thereby make those acts non-fraudulent, so as to

10   fall outside coverage of a fidelity bond that insured the corporation against monetary loss

11   due to its employees' fraudulent or dishonest acts); Midland Bank & Trust Co. v. Fid. &

12   Deposit Co. of Maryland, 442 F. Supp. 960, 973 (D.N.J. 1977) (citing Gen. Fin. Corp. to

13   make an alternative holding that even if a bank's board ratified its agents' fraud, such acts

14   cannot be ratified so as to excuse payment under a fidelity bond which indemnified the bank

15   against a loss sustained due to an employee's fraud).  The third case upon which Defendants

16   rely sets forth an exception to a pre-suit demand requirement under Missouri state law for a

17   shareholder to bring a derivative suit.  Wolgin v. Simon, 722 F.2d 389, 392 (8th Cir. 1983).

18   Under Missouri law, a shareholder may forego pre-suit demand on other shareholders

19   "where the officers or directors of the corporation have committed ultra vires, illegal or

20   fraudulent acts because these acts cannot be ratified by shareholders."  Id.  These cases do

21   not preclude the possibility that a principal may ratify its agent's fraudulent acts and thereby

22   become liable to a third party injured by that fraud.

23      More importantly, none of the cases Defendants cite are Nevada cases.  Nevada

24   has held a principal may ratify its agent's illegal acts.  See Cardinal v. C. H. Masland &

25   Sons, 495 P.2d 364, 364-65 (Nev. 1972) (adopting the position of the dissent in Cardinal v.

26   C. H. Masland & Sons, 484 P.2d 1075, 1079 (Nev. 1971) and holding that a company could

1   ratify one partner's forgery); see also Nev. Rev. Stat. §§ 42.007(1)(b), 42.005(1) (providing

2   that an employer may be liable for exemplary or punitive damages for the fraudulent acts of

3   its employee if it "expressly authorized or ratified the wrongful act of the employee for

4   which the damages are awarded"); Restatement (Second) of Agency § 84 cmt. a, illus. 5.

5   Thus, Nevada law does not categorically preclude the possibility that a principal can ratify

6   its agent's fraudulent acts.  The Court therefore will deny Defendants' Motion for Partial

7   Summary Judgment on Count 12 as to ratification.

8           **D.  Conspiracy**

9           In a footnote, Defendants argue that Plaintiffs cannot simultaneously predicate

10  Marcus Hotels' liability on an agency relationship and a conspiracy because under Nevada

11  law, corporate agents cannot conspire with their corporate principal.  Plaintiffs respond that

12  an exception to this general rule exists where an agent does not act solely for the benefit of

13  its principal.  Plaintiffs also argue they may present alternative theories.

14          Under Nevada law, "[a]gents . . . of a corporation cannot conspire with their

15  corporate principal . . . where they act in their official capacities on behalf of the

16  corporation and not as individuals for their individual advantage."  Collins v. Union Fed.

17  Sav. & Loan Ass'n, 662 P.2d 610, 622 (Nev. 1983).  Thus, to the extent Plaintiffs establish

18  an agency relationship between Marcus Hotels and Platinum Development or its sales

19  representatives, Plaintiffs may not also recover under a conspiracy theory.  Although

20  Plaintiffs mention the exception regarding an agent acting for his individual benefit,

21  Plaintiffs cite to no evidence raising an issue of fact that any purported agent in this action

22  was doing anything other than acting for the principal's benefit.  (See Pls.' Opp'n at 23.)

23          However, Plaintiffs contend they are entitled to pursue alternative theories of

24  relief.  Defendants do not respond to this argument.  Generally, a party may pursue

25  alternative theories of recovery, even if inconsistent.  See Fed. R. Civ. P. 8(d)(3).  Plaintiffs

26  may not recover under both theories, but they are not precluded from making alternative

1   arguments as to why Marcus Hotels is liable in this case.  The Court therefore will not

2   dismiss either the agency or conspiracy theories of liability based on an inconsistency

3   between the two.

4   **III.  CONCLUSION**

5          IT IS THEREFORE ORDERED that Defendants' Motion for Partial Summary

6   Judgment on Count 12 (Doc. #166) is hereby GRANTED in part and DENIED in part.  The

7   Motion is granted to the extent that no agency relationship based on actual authority existed

8   as a matter of law.  The Motion is denied in all other respects.

9

10  DATED:  July 10, 2012

11                                                          _____

12                                                          PHILIP M. PRO
                                                            United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26